RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

DOROTHY JONES, as personal representative of the estate
of Denise Michelle Jones, deceased,

*Plaintiff-Appellant,*

No. 04-2320

*v.*

AARON REYNOLDS; MUSTAPHA M. ATAT; CITY OF
LINCOLN PARK; WILLIAM KISH, III; JOSEPH LAVIS;
DOUGLAS MUNCEY; MOHAMED NASSER,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 03-71770, 03-72418—Victoria A. Roberts, District Judge.

Argued: November 2, 2005

Decided and Filed: February 27, 2006

Before: MOORE and SUTTON, Circuit Judges; BUNNING, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Joseph Dedvukaj, Southfield, Michigan, for Appellant. Michelle A. Thomas, THOMAS, DeGROOD & WITENOFF, Southfield, Michigan, Rosalind Rochkind, GARAN LUCOW MILLER, Detroit, Michigan, for Appellees. **ON BRIEF:** Joseph Dedvukaj, Southfield, Michigan, for Appellant. Michelle A. Thomas, THOMAS, DeGROOD & WITENOFF, Southfield, Michigan, Rosalind Rochkind, John J. Gillooly, GARAN LUCOW MILLER, Detroit, Michigan, for Appellees.

SUTTON, J., delivered the opinion of the court, in which BUNNING, D. J., joined. MOORE, J. (pp. 11-17), delivered a separate dissenting opinion.

_____

## OPINION

_____

SUTTON, Circuit Judge. At 1:45 a.m. on October 8, 2001, Aaron Reynolds and Mustapha Atat began a drag race on a public street on the outskirts of Detroit. After roughly one-sixth of a mile, Reynolds lost control of his car and it veered into a crowd of spectators, striking Denise Jones and killing her. What

_____

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

separates this calamity from many others is that police officers from the City of Lincoln Park, a suburb of Detroit, arrived at the scene before the race and had an opportunity to prevent it from beginning. Not only did they fail to stop the race but, so far as this summary-judgment record shows, they also expressly allowed the participants to proceed with the race. For their part in this incident, the officers faced separate state-law criminal charges, a separate state-law civil lawsuit and eventually this § 1983 action, which claimed that the misconduct of the officers and the City of Lincoln Park violated Jones' substantive due process rights.

When a claimant attempts to hold public officials responsible for private acts of violence under the Fourteenth Amendment, as this § 1983 action does, the depravity of the fact pattern often is enough to make "a devil[] sick of sin." Wilfred Owen, *Dulce Et Decorum Est* (1918). This case is no exception. And when a claimant argues that government officials failed to prevent private individuals from causing another injury, as this § 1983 action does, *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), and its progeny rarely permit the claim to go forward. This case is no exception. Because the officers did not have custody of Denise Jones at the time of the accident, because the officers' actions did not place Denise Jones in any more danger than she voluntarily undertook before they arrived and because the officers' participation in this tragedy did not specially place Denise Jones at any more risk than the 150–300 people attending the drag race, all relevant precedent requires us to uphold the judgment of the district court summarily rejecting this constitutional claim.

I.

In the early morning hours of October 8, 2001, four Lincoln Park police officers—William Kish III, Joseph Lavis, Douglas Muncey, Mohamed Nasser—came upon a crowd of individuals at the intersection of Fort Street and Outer Drive in the City of Detroit, which borders Lincoln Park. The crowd of individuals, as it turns out, were spectators awaiting the beginning of a drag race.

While the officers claim that they arrived at the scene five to ten minutes before the race, others claim that they arrived up to an hour before the race started. Several individuals saw officer Nasser approach the drag racers, speak briefly with Mustapha Atat, then return to his police car. Aaron Reynolds, the other drag racer, stated that he intended to abandon the race when the police arrived but proceeded with the race when officer Nasser told Atat that they could "go ahead and race." JA 1041. One spectator claimed to have seen officer Nasser place a bet on the race after he talked to Atat. After the officers returned to their two police vehicles in the parking lot on the Lincoln Park side of the street, several bystanders heard one of the officers announce over his car's public address system that "[w]e are not [here] to arrest anyone, go ahead with the race," JA 1046, and then heard the officer play rap music over the public address system. The officers claim that they made no such announcement and played music for just "two seconds" and, even then, only to alert the crowd that they were watching and intended to break up the gathering. Spectators estimated that the crowd ranged in size from 150–300 people and noted that the intersection of Fort Street and Outer Drive, which is in Detroit, was completely blocked by the race participants and spectators, preventing traffic into and out of Lincoln Park.

At about 1:45 a.m., the two cars raced north on Fort Street, which is in Detroit, away from the officers. Despite having been at the scene before the race began, the officers did not notify the Lincoln Park police dispatcher, as was department procedure, or attempt to break up the crowd aside from playing music over their public-address system, which was not department procedure. The cars proceeded north at 130 or so miles per hour before Reynolds lost control of his car about one-sixth of a mile from the start of the race. He veered into the crowd, and his car struck several spectators, including Denise Jones, who died from injuries suffered from the collision. After the accident, the officers contacted their dispatcher, who contacted Detroit police. Once the Detroit police arrived, the Lincoln Park police left without giving statements. The Lincoln Park Police Department learned that its officers had been at the scene of the accident only through subsequent media coverage.

The accident prompted several criminal and civil actions. Reynolds pleaded guilty to involuntary manslaughter, failure to stop at the scene of an accident resulting in death, two counts of felonious driving, and drag racing. Atat faced similar charges but fled the country before he could be prosecuted. Officers Nasser, Muncey and Lavis pleaded no contest to criminal charges of neglect of duty. On March 28, 2003, the Michigan circuit court granted a $25 million default judgment to Dorothy Jones, suing on behalf of the decedent, against the drivers. The court granted summary judgment against Jones on her state tort claims against the officers and the City of Lincoln Park, concluding that "the proximate cause" of the death was Reynolds alone. *See Jones v. Reynolds*, No. 250616, slip op. at *6 (Mich. Cir. Ct. Apr. 7, 2005); *see also* Mich. Comp. Laws § 691.1407(2); *Robinson v. City of Detroit*, 613 N.W.2d 307 (Mich. 2000).

Pursuing further legal remedies, Dorothy Jones filed this § 1983 action against the officers and the City of Lincoln Park in federal district court. The district court granted summary judgment to the City and the officers on all of Jones' claims. As to the officers, the court held that Jones "offered no evidence that they knew or had reason to know that the decedent specifically was in any more danger than any other citizen in the area that evening." D. Ct. Op. at 19 (emphasis omitted). As to the City of Lincoln Park, the court held that there was "no evidence of an affirmative act by the City" or that the City knew or should have known of the risk. *Id*. at 24. Jones challenges both conclusions on appeal, where we apply a de novo standard of review, *Beecham v. Henderson County*, 422 F.3d 372 (6th Cir. 2005), view the evidence in the light most favorable to the non-moving party, *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146 (6th Cir. 1995), and will affirm a grant of summary judgment if the record evidence does not establish a genuine issue of material fact, *Beecham*, 422 F.3d at 374.

## II.

Section 1983 provides a federal cause of action for civil damages against an individual acting under color of state law who deprives another of "rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. In this case, Jones argues that the officers violated the substantive due process guarantees of the Fourteenth Amendment when they failed to protect Denise Jones from the perils of an illegal drag race organized by private citizens on the streets of the City of Detroit. To overcome the officers' qualified immunity from this individual-liability action, Jones must make two showings: that the officers violated the decedent's constitutional rights and that those rights were "clearly established" at the time of the incident. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court has told lower courts that they "must" address the "initial inquiry" before reaching the "clearly established" question. *Id*.

### A.

"[N]othing in the language of the Due Process Clause itself," the Court has instructed, "requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). While "[a] State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes," the Court has reasoned that such duties will not be "thrust upon them by this Court's expansion of the Due Process Clause of the Fourteenth Amendment." *Id*. at 202–03. The Court has recognized one exception to the *DeShaney* rule: When the State has so restrained the liberty of the individual that it renders him unable to care for himself, the State has a special relationship with the individual and thus an affirmative duty to protect him. *Id*. at 200. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id*. Accordingly, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the deprivation of liberty triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Id*. (internal quotation marks omitted).

Since *DeShaney*, this circuit has recognized a second exception to the prohibition against holding public officials constitutionally responsible for private acts of violence. Relying on the following language from *DeShaney*—"[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them," *id*. at 201—we have held that when the State "cause[s] or greatly increase[s] the risk of harm to its citizens . . . through its own affirmative acts," it has established a "special danger" and a duty to protect its citizens from that risk. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998). To bring a "state created danger" claim, the individual must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003); *see Kallstrom*, 136 F.3d at 1066.

B.

In this case, Jones has not argued that the officers placed Jones in custody or otherwise restrained her liberty in a way that prohibited her from taking care of herself. The custodial or special-relationship theory of liability thus does not apply. *Cf. Stemler v. City of Florence*, 126 F.3d 856, 868 (6th Cir. 1997) ("[T]he officers took the affirmative act of restraining [the individual's] freedom to act on her [own] behalf, and consequently imposed upon themselves a duty to ensure that they were not placing her in danger. Their actions were, in the words of *DeShaney*, a restraint on [her] personal liberty, not a failure to act on her behalf.") (internal quotation marks omitted). That leaves the possibility that Jones can establish a "state created danger." In our view, she cannot satisfy this "demanding standard for constitutional liability." *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 913 (6th Cir. 1995).

1.

Jones cannot show that the officers engaged in a cognizable "affirmative act" that "created" this "danger." "There is no evidence that [the officers] took any *affirmative* action that exposed decedent to any danger to which she was not already exposed." *Sargi*, 70 F.3d at 913. Nothing in the record indicates that the race would not have proceeded if the officers had never arrived at the scene. And nothing in the record indicates that the officers made Jones "more vulnerable" to the risk that she had already undertaken by voluntarily choosing to watch the race. *Gazette v. City of Pontiac*, 41 F.3d 1061, 1065 (6th Cir. 1994) ("[A] duty to protect can arise in a non-custodial setting if the state does anything to render an individual *more vulnerable* to danger."); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) (holding that officials' "affirmative actions" must "directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way"); *Kallstrom*, 136 F.3d at 1066 ("[W]hile the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts."); *Peach v. Smith County*, No. 02-6194, 2004 U.S. App. LEXIS 2885, at *12 (6th Cir. Feb. 17, 2004) (holding that "no evidence exists that the Smith County defendants' actions created the danger at issue" when they failed to seize all weapons during an arrest and the arrestee later shot and killed his girlfriend).

Jones also cannot establish that the officers "increased" her risk of danger when they failed to stop the race. The officers, it is true, came upon an illegal drag race and failed to stop it—or at least discourage it if, as appears to be the case, the race was being held on streets beyond their jurisdiction. But a "failure to act is not an affirmative act under the state-created danger theory," *Cartwright*, 336 F.3d at 493—as numerous cases demonstrate, *see Schroder v. City of Fort Thomas*, 412 F.3d 724, 728–29 (6th Cir. 2005) (failing to respond to parental complaints about the lack of enforcement of a residential speed limit in a specific neighborhood was not an affirmative act); *Jones v. Union County*, 296 F.3d 417, 431 (6th Cir. 2002) (failing to serve an ex parte protection order on an abusive spouse was not an affirmative act); *Sheets v. Mullins*, 287 F.3d 581, 588–89 (6th Cir. 2002) (failing to pursue and investigate a domestic-disturbance call

was not an affirmative act); *Weeks v. Portage County Executive Offices*, 235 F.3d 275, 279 (6th Cir. 2000) (failing to call an ambulance for an obviously injured citizen was not an affirmative act); *Sargi*, 70 F.3d at 912–13 (failing to obtain immediate medical assistance for seizure victim and instead taking her home was not an affirmative act); *Robinson v. Twp. of Redford*, No. 04-1117, 2005 U.S. App. LEXIS 15003, at *15 (6th Cir. July 20, 2005) (failing to search a room after the report of a break-in was not an affirmative act); *Bullard v. Inkster Hous. and Re-Dev. Comm'n*, No. 04-1051, 2005 U.S. App. LEXIS 5083, at *6 (6th Cir. Mar. 29, 2005) (failing to provide adequate security measures for apartment door to prevent break-ins was not an affirmative act); *Peach*, 2004 U.S. App. LEXIS 2885, at *6–8 (failing to respond to a call informing police that a woman battered by her husband was returning to spend time with him and that he had a gun was not an affirmative act); *cf. Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996) (pre-*Kallstrom* case stating that failing to protect a student from sexual harassment and a rape by another student did not violate substantive due process).

Whether the conduct of government officials in some cases should be treated as a failure to act or as action "may be a difficult question in the abstract," *Bukowski*, 326 F.3d at 709, but we have always treated governmental conduct as "fall[ing] on the inaction side of the line," *id.*, when it does not create or increase the risk of peril posed by the private actor. *See May v. Franklin County Comm'rs*, 2006 U.S. App. LEXIS 3528, at *17 (6th Cir. 2006) (act of dispatching officers to the scene of a domestic dispute did not increase the risk of harm to the victim and thus did not constitute an affirmative act); *id.* ("Thus even when we accept the testimony of plaintiff's expert, which we must do at the summary judgment stage, May has not produced any evidence that the appellees' act of dispatching an officer to the scene increased the risk of harm to Kirk."); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 467 (6th Cir. 2006) (act of leaving students unsupervised in a classroom, after which one student shot another, did not increase the risk of harm to the victim and thus did not constitute an affirmative act); *Jackson v. Schultz*, 429 F.3d 586, 591–92 (6th Cir. 2005) (act of placing a patient in the back of an ambulance did not increase the risk of harm to the victim and thus did not constitute an affirmative act); *Gazette*, 41 F.3d at 1065 (act of lying to the victim's family about the extent to which a kidnapping had been investigated did not increase the risk of harm to the victim and thus did not constitute an affirmative act); *Robinson*, 2005 U.S. App. LEXIS 15003, at *14 (act of assuring shopkeeper that intruder had left the scene did not increase the risk to the victim and thus did not constitute an affirmative act). As these cases indicate, when state action or inaction "neither increase[s] decedent's risk of harm nor render[s] her more vulnerable," *Sargi*, 70 F.3d at 913, the plaintiff cannot establish a cognizable "affirmative act."

Nor can Jones escape this conclusion by emphasizing that the drag racers planned to abandon the race once they saw the officers and would not have proceeded with the race had the officers not told them they could do so. "The question is not whether the victim was safer *during* the state action, but whether [she] was safer *before* the state action than [she] was *after* it." *Cartwright*, 336 F.3d at 493. No evidence indicates that the drag race would not have proceeded had the officers never arrived, and no evidence indicates that the officers' actions, whether characterized as allowing the race to proceed or as encouraging it, increased the risk to spectators at the race in general or to Jones in particular. To the contrary, the lead premise of Jones' claim is that the drivers were prepared to start the race until the officers came and would have abandoned the race had the officers told them to leave. When the officers nonetheless permitted the race to start, however, plaintiff cannot show that they aggravated the risk of harm to Denise Jones beyond the perils she already faced by voluntarily choosing to watch a drag race on city streets at 1:45 in the morning.

In *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003), we faced a similar affirmative-act problem. Relying on internet communications, a 39 year old male (Hall) manipulated a mentally disabled 19 year old girl into traveling nine hours by bus to his home, where he raped her. When the parents learned that their daughter was missing, they contacted the police who eventually obtained custody of the girl. Soon after being brought into custody, the girl said that she wanted to return to the man's home. Because the police did not believe that they had authority to detain the girl (even though they thought she was "slow," *id.* at 706) and because her parents had not yet arrived at the police station, they returned the girl to the

man's house, where the abuse continued, and they did so without speaking to the girl's parents about their decision.

In rejecting the girl's substantive due process claim against the officers and city, *Bukowski* held that she had not established an "affirmative act," reasoning as follows:

> Although in *DeShaney* the state returned Joshua to the ultimate aggressor, the *DeShaney* Court explicitly rejected the idea that such acts met the state-action requirement. The Court in *DeShaney* was not merely assuming that state actors did not contribute to the hazards faced by Joshua, but it was also holding that the act of returning someone to the same dangers that existed status quo ante does not satisfy the state-action requirement.
>
> Examining the quality of governmental involvement here, it is apparent that the government was no more involved in making Bukowski more vulnerable to private violence than it was in *DeShaney—in both cases, the government was merely returning a person to a situation with a preexisting danger*. The plaintiffs' argument that the officials encouraged Hall by their act of returning Bukowski is really the same as the argument that the officials encouraged Hall by their refusal to get involved.

326 F.3d at 709 (emphasis added) (internal citation and quotation omitted).

A similar conclusion applies here. "Whether or not the defendants 'acted' may be a difficult question in the abstract, but *DeShaney* [and *Bukowski*] make[] clear that the acts of the officials here clearly fall on the inaction side of the line." *Id*. Indeed, *DeShaney* and *Bukowski* would seem to present the harder fact patterns. In both cases, the police temporarily removed vulnerable individuals from danger by taking them into custody. And when they returned the victims to the same special danger, the courts nonetheless held that no liability ensued because "the government was merely returning a person to a situation with a preexisting danger." *Id*. at 709; *DeShaney*, 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all.").

Here, by comparison, the police never took Jones into custody and (so far as the record shows) never had any interaction with her at all. In point of fact, neither party has presented any evidence that Denise Jones was even at the scene when the officers arrived. But even if she was there at that time, both parties agree that she stood on the sidewalk, was almost 266 yards from the start of the race, was still farther from the Lincoln Park Palace parking lot (where the two police cars were parked) and was well within the jurisdiction of the City of Detroit. Under these circumstances, the most that one could say is that when the police arrived they had temporary control (or loose "custody") of the drivers and that they could have retained that control and either stopped the race from occurring (assuming of course that they had jurisdiction over this street) or at least urged the drivers not to race. As in *DeShaney* and *Bukowksi*, they chose not to retain that control and "placed [the drivers and spectators] in no worse position than that in which [they] would have been had [the officers] not acted at all." 489 U.S. at 201; *id*. ("While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them.").

Even if an officer bet on the drag race, as one spectator alleges, and even if the officers played rap music for 15 minutes rather than 2 minutes, as other spectators allege, that does not change matters. While such conduct certainly would not have discouraged the participants from proceeding with the race, it also cannot be said that it placed the drivers or spectators in greater danger than if the police had never arrived. As deeply regrettable and ultimately tragic as the officers' actions were, no evidence suggests that their conduct altered the risk of harm to Denise Jones. *See McQueen*, 433 F.3d at 466 ("[J]ust as the plaintiffs in *Cartwright* and *Bukowski* would have faced at least the same danger if the police had not acted, Doe

would have faced the danger of Smith drawing his gun and firing at her even if [her teacher] had not acted.").

Further breaking the link between the officers' actions and Jones' death is the uncontested fact that the officers played no role in Jones' decision to attend the drag race. Unlike the victims in *DeShaney* and *Bukowski*, who not only each were temporarily in the custody of the State but also faced age and disability restrictions in their ability to care for themselves, the officers never met Jones (much less took custody over her) and no one has offered any evidence as to why she could not have looked after herself in choosing whether to be a spectator at a dangerous event. When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say that the "state" has "created" the "danger" to her by its affirmative acts. *See Summar v. Bennett*, 157 F.3d 1054, 1059 n.2 (6th Cir. 1998) (rejecting claim because decedent's "voluntary decision to become a confidential informant with all the dangers it presented, not to mention his poor decision to fraternize with criminals in the first place, played a much greater role in his unfortunate demise"); *Robinson*, 2005 U.S. App. LEXIS 15003, at *14–15 ("[T]he causal relationship between the officers' assurances of safety and Robinson's murder is tenuous in light of intervening choices made by the decedent. The officers . . . did not force or instruct the decedent to remain in the building."); *Peach*, 2004 U.S. App. LEXIS 2885, at *12–13 ("[I]t was [the decedent] who independently and voluntarily chose to visit, camp with and stay with Carr after the County issued the order of protection . . . . This undisputed fact also serves to break any alleged link between the murder and the actions of the Smith County defendants.").

Attempting to alter this conclusion, Jones points to several other decisions. None is convincing. "[W]ith respect to non-custodial cases," one of them, *Nishiyama v. Dickson County*, 814 F.2d 277 (6th Cir. 1987), "[is] no longer an accurate statement of the law after *DeShaney* and *Collins*," *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir. 1997), and at any rate involves the risk-creating act of allowing an inmate to drive a police car unsupervised, *Nishiyama*, 814 F.2d at 279. Another, *Davis v. Brady*, 143 F.3d 1021 (6th Cir. 1998), was cited for the first time in Jones' reply brief, where new arguments may not be made, *Rush v. Ill. Cent. R.R. Co.*, 399 F.3d 705, 727 n.19 (6th Cir. 2005). Like *Nishiyama*, at any rate, *Davis* involves the risk-enhancing (if not custodial) act of taking an intoxicated individual into custody, then leaving him on the side of a busy highway far from town. 143 F.3d at 1023. The remaining two cases, *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993), and *Reed v. Gardner*, 986 F.2d 1122 (7th Cir. 1993), also appear for the first time in the reply brief and are from other circuits to boot. Both cases, moreover, involved victims who faced little danger before the police intervened and greater peril after the police acted. *See Dwares*, 985 F.2d at 100 (holding that an affirmative act had been established when police told "skinheads" that they would not intervene if they beat up demonstrators participating in a fully licensed rally because the police were providing security for the demonstrators); *Reed*, 986 F.2d at 1126 (holding that an affirmative act had been established when police arrested a sober driver, took her into custody and left her visibly drunk husband to operate the car).

The dissent raises several other points that deserve consideration. What would happen if the officers had not merely said they would decline to stop the race but instead had actually participated in the race—for example, by waving a flag to signal the start of the race, by doing the play-by-play for the race or by driving one of the cars in the race? Dissent Op. at 12–13. We agree that these examples likely would state a constitutional claim but not because they would establish a claim under *DeShaney*. Had the officers organized or participated in this race, the issue would cease to turn on whether they were responsible for harm caused by a private actor and would turn instead on whether they had caused the harm themselves. *See County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998) (noting that officers will be liable under the Due Process Clause for injuries caused by "grossly negligent" or "reckless" conduct that "shock[s] the conscience").

Under these circumstances, we would have no reason to determine whether the officers had increased the risk of harm to the victim because they would be *the source* of that risk. Here, however, Jones has not alleged that the officers had anything to do with the organization of the race or that they participated

in it. All of which explains why plaintiff has not presented this case as one in which the officers directly harmed Denise Jones but rather as one in which they allowed private actors to harm her. Yet in order to establish a state-created danger under our case law, plaintiff must show that the state actor increased the risk of harm to the victim—namely, by showing that the government did more than "merely returning a person to a situation with a preexisting danger." *Bukowski*, 326 F.3d at 709.

In some circumstances, we agree, an officer's encouragement of private illegal acts may state a constitutional claim, but that is because in some circumstances such encouragement will increase the risk of harm to the victim and because in some circumstances private misconduct will become public misconduct when it occurs at the prompting of public officials. Yet, as shown, plaintiff has not claimed—and cannot tenably claim on this record—that the officers' actions either created or increased the risk of harm to Denise Jones. In marked contrast, if an officer (inexplicably) had encouraged the assailant in *Bukowski* to rape the victim or if an officer (inexplicably) had encouraged the father in *DeShaney* to beat his son, both officers plainly would have increased the risk of danger to the victims. *See* Dissent Op. at 14. The same simply is not true here. By allegedly choosing not to stop the race and by allegedly saying to the drivers that they "could go ahead and race," JA 1042, the officers acted irresponsibly but they did not increase the risk of harm facing Denise Jones and the 150 or so other people that chose voluntarily to attend the race. For like reasons, *Pena v. DePrisco*, 432 F.3d 98 (2d Cir. 2005), does not lead to a different conclusion. There, by continually condoning excessive drinking and driving over the course of an evening, the officers increased the risk that their fellow officer would cause harm.

As *DeShaney* and *Bukowski* both show, the time frame for assessing whether an affirmative act has occurred is not *after* the officers have arrived and temporarily taken control of the situation but *before* the officers have arrived. In both decisions, the officers took custody of the vulnerable victims and removed the risk of harm to them and only later returned them to the same risk they had faced before their arrival. Were it true that the question whether the officers increased the risk of harm to the victim must be answered from a different vantage point—namely, *after* the officers have arrived on the scene and temporarily removed the risk of harm, *see* Dissent Op. at 13—*DeShaney* and *Bukowski* would have come out differently. Both decisions involved fact patterns in which the officers plainly increased the risk of harm to the victims—if, that is, the proper vantage point is after, not before, the officers arrived. Instead, however, both decisions rejected the claims, concluding that "the government was merely returning a person to a situation with a preexisting danger." *Bukowski*, 326 F.3d at 709; *DeShaney*, 489 U.S. at 201 ("That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all."). *See also Cartwright*, 336 F.3d at 493 ("The question is not whether the victim was safer *during* the state action, but whether [she] was safer *before* the state action than [she] was *after* it.").

All things considered, Jones "cannot show" what our cases require—"that defendant officers created or increased the risk that [Jones] would be struck by a vehicle." *Cartwright*, 336 F.3d at 493. Because Jones has failed to establish a cognizable "affirmative act," we must reject her claim against the officers as a matter of law.

2.

Jones also has failed to show that the district court erred in holding that she did not satisfy the second prong of this claim—the "special danger" requirement. A special danger exists "where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Kallstrom*, 136 F.3d at 1066. In the only cases where we have recognized a "state created danger," the government could have specified whom it was putting at risk, nearly to the point of naming the possible victim or victims. *See Caldwell v. City of Louisville*, No. 03-5342, 2004 U.S. App. LEXIS 25548, at *17 (6th Cir. Dec. 9, 2004) (concluding that where the threat posed by an abusive husband was only to his wife, the state action "place[d] the victim specifically at risk"); *Waller v. Trippett*, No. 01-2716, 2002 U.S. App. LEXIS 21502, at *15 (6th Cir. Oct. 10, 2002) (concluding that public employees working in a prison kitchen were

a "limited and specifically definable group," satisfying the special-danger requirement); *Duvall v. Ford*, No. 98-5777, 1999 U.S. App. LEXIS 15161 (6th Cir. July 1, 1999) (dismissing on grounds of no affirmative act but acknowledging specific endangerment where a prisoner incarcerated for abusing his wife escaped and fired shots into the trailer where she was living, injuring a family member); *Kallstrom*, 136 F.3d at 1067 (releasing the personnel files of undercover officers, including information about their families and homes, to defense attorneys specifically endangered the officers and their families).

When by comparison the victim was not identifiable at the time of the alleged state action/inaction, we have held that a § 1983 suit may not be brought under the "state created danger" theory. *See Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (failing to enforce or lower the speed limit on a residential street "did not create a 'special danger' to a discrete class of individuals (of which the Schroders' son was a member), as opposed to a general traffic risk to pedestrians and other automobiles"); *Jones v. City of Carlisle*, 3 F.3d 945, 949–50 (6th Cir. 1993) (holding that an epileptic driver was "no more a danger to [the plaintiff] than to any other citizen on the City streets"); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (holding that the release of an inmate on parole, who eventually murdered a citizen, did not violate the Due Process Clause because "there is [no] showing that the victim, as distinguished from the public at large, faces a special danger"); *see also Bullard*, 2005 U.S. App. LEXIS 5083, at *7 (holding that a public-housing resident threatened by poor security in her building could "not meet th[e] very high burden of proving that the state knew or should have known that its actions specifically endangered the plaintiff") (internal quotation marks omitted); *Kennerly v. Montgomery County Bd. of Comm'rs*, 257 F. Supp. 2d 1037, 1044 (S.D. Ohio 2003) ("[A] plaintiff cannot merely . . . nam[e] a more particular sub-class of the public as the group to which the government owed a duty, such as one's 'neighbors.' Neighbors are still the public. *Kallstrom* is not ambiguous: the government must be aware that its actions will increase the vulnerability of a specific individual to criminal danger.").

Jones cannot satisfy this standard. The officers never interacted with Denise Jones. No evidence has been put forward suggesting that the officers had any reason to know that they were putting her at risk by their action/inaction that night. And witnesses to this tragedy estimated that the crowd contained at least 150 people at the time of the race. That figure plainly is more than a handful of people specially put at risk by state action or inaction. And, indeed, it is not unlike the number of people put at risk when the police allegedly failed to enforce a speed limit on a residential street. *See Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005). In *Schroder*, we concluded that there was no special danger despite the fact that Mrs. Schroder had been campaigning for a reduced speed limit (or better enforcement of the current speed limit) on a particular stretch of a residential street on which her family lived and despite the fact that the boy killed was in fact Schroder's son because the threatened group (people who lived on the street) was not sufficiently "discrete." *Id.* at 729. Nor does *McQueen v. Beecher Community School*, 433 F.3d 460 (6th Cir. 2006), alter this conclusion. There, the victim was one of "five children[] left in a room alone with an armed classmate." *Id.* at 468. Unlike the crowd of at least 150 people lining the drag race route, a handful of students were endangered by the teacher's conduct, and their identities were clear to the teacher at the time she acted (or did not act). Likewise unavailing is *Mitchell v. Duval County School Board*, 107 F.3d 837, 839 (11th Cir. 1997), which concluded "that the pleadings nevertheless failed to present facts sufficient to give rise to liability under the special danger theory" in part because the danger to the victim was not "distinguishable from that [to] the general public." *Id.* at 839–40. Indeed, we are not aware of any case from our circuit, or any other, in which a "special danger" was found with respect to a group of 150 people allegedly placed "specially" at risk by state action. Jones' claim thus independently fails on this ground as well.

C.

Even if there were doubt about these conclusions, it is clear at a minimum that Jones has not shown a violation of constitutional rights that were "clearly established" at the time of the officers' action/inaction. No authority from our circuit extant at the time of the incident even begins to suggest that the 150 people at the drag race would satisfy the "special danger" requirement. And no authority from our circuit supports

the theory that the officers committed a cognizable affirmative act when they did not create or increase the danger to Denise Jones that she voluntarily undertook before they arrived.

## III.

In view of these conclusions, Jones' claim against the City of Lincoln Park also fails as a matter of law. "[T]he determination that the City's officials did not violate the plaintiffs' constitutional rights resolves the claim against the City as well." *Bukowski*, 326 F.3d at 712–13. Accordingly, whether it was the policy of the department not to stop drag races occurring in Detroit (as Jones claims) or whether state law prevented the department's intervention (as the City claims) makes no difference to the outcome of this dispute. That the officers did not violate Denise Jones' constitutional rights eliminates any potential derivative liability of the City.

* * * * *

As is so often true in "state created danger" cases, there is much to lament about what happened here. The Lincoln Park police officers behaved exceedingly badly. The drivers had no business racing their cars on Detroit city streets. And Denise Jones exercised poor judgment in attending the race.

The most grating feature of this calamity, however, is that the police, a group upon whom we rely for public safety, had only to exercise reasonable judgment, indeed even below-average judgment, to prevent October 8, 2001 from being anything other than a late-night out for Denise Jones. Yes, the Lincoln Park officers did not have jurisdiction over Detroit city streets. Yes, their lack of jurisdiction over Detroit city streets makes one wonder whom the officers could reasonably assure that this illegal drag race would not be prosecuted—as in fact it eventually was. And yes, as the Michigan courts held, the "proximate cause" of this accident was the actions of the drivers, not the officers. *See Jones v. Reynolds*, No. 250616, slip op. at *6 (Mich. Cir. Ct. April 7, 2005). But by expressly allowing the about-to-begin race to proceed, if not encouraging it to proceed, the officers gave law enforcement a bad name.

Faced with these kinds of assertions, it is tempting to say that they satisfy the "state created danger" doctrine. But, to do so, we would have to say that the doctrine covers conduct it does not—that it covers state action that does not create or increase the risk of danger to the victim and that it applies to state action that does not specifically increase the risk of danger to a discrete individual or group of individuals. And even were we to move the doctrine in these directions, that would not advance this claim because the very act of modifying these rules would defeat plaintiff's obligation to show that the officers violated "clearly established" law. While we decline to extend the doctrine in this case, nothing in our decision prevents future litigants from arguing what the plaintiff has not argued here—that the alleged actions of the officers converted the private misconduct of the drivers into public misconduct and in the process converted this claim into a direct-injury constitutional claim under the *Lewis*, as opposed to *DeShaney*, line of cases.

As *DeShaney* reminds us, moreover, our decision does not prevent the Michigan legislature from creating "a system of liability" that "would place upon the State and its officials the responsibility" for conduct like this. 489 U.S. at 203. But if the Supreme Court refused to "thrust" such liability upon the State under the Due Process Clause in a case in which the public officials returned a helpless child to his abusive father, only to have him beaten repeatedly until "he suffered brain damage so severe that he is expected to spend the rest of his life confined to an institution," *DeShaney*, 489 U.S. at 192–93, 203, and if the fact pattern presented here likewise shows that the "State" did not "create" this "danger," we are not comfortable imposing such liability here.

## IV.

For these reasons, we affirm.

——————————

**DISSENT**

——————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  On October 8, 2001, Aaron Reynolds ("Reynolds") lost control of the car he was driving in an illegal drag race.  The vehicle careened into a crowd of spectators, striking and killing Denise Jones ("Jones").  Several Lincoln Park police officers arrived at the scene before the race began and did not stop it, but this is emphatically *not* what this case is about.  What really matters is Jones's evidence that the race was about to be called off for fear of police intervention but ultimately went forward after the officers actively encouraged the race to proceed, reassuring the drag racers and the crowd that nobody would be arrested for conducting the race.  Because I believe that this evidence, if credited by a jury, establishes both an affirmative act and a special danger under the state-created-danger theory, I would reverse and remand the case to allow the district court to address the issue of state culpability in the first instance.  Thus, I respectfully dissent.

**I.**

I present the following facts drawn from the record in order to give a fuller picture of the crucial events that transpired on October 8, 2001.  Naturally, the defendants dispute much of this account, but given the procedural posture, we must view the evidence in the light most favorable to Jones.

There is evidence in the record to suggest that the race would have been cancelled because of the officers' arrival at the scene.  According to an eyewitness, "[e]verybody was fittin' to leave because they [saw] the police."  Joint Appendix ("J.A.") at 281 (Young Dep. at 22).  Indeed, some vehicles drove away soon after the officers' arrival.  J.A. at 1219 (Muncey Statement at 6).  Moreover, Reynolds, the driver of the car that struck Jones, "was afraid to race when the Lincoln Park Police first drove up" for fear of being arrested, so he "was in the process of putting [his] car back onto the trailer, to call off the race."  J.A. at 1041 (Reynolds Aff. at 2); *see also* J.A. at 281 (Young Dep. at 22) ("[T]hey [were] about to pack up and leave.").

Of course, the race was not called off.  At least one officer — apparently Officer Mohamed Nasser ("Officer Nasser") — briefly spoke to Reynolds and the other drag racer, Mustapha Atat ("Atat").  J.A. at 281-82 (Young Dep. at 22-23), 1041 (Reynolds Aff. at 2), 1046 (Ricks Aff. at 2), 1053 (Moore Aff. at 1), 1239 (Request for Warrant/Investigator's Report at 1).  Officer Nasser told Reynolds that the officers "want[ed] to see the race."  J.A. at 1041 (Reynolds Aff. at 2).  On the way back to his vehicle, Officer Nasser was seen placing a wager on the drag race.  J.A. at 1053 (Moore Aff. at 1).  Officer Nasser returned to his cruiser, "got on his loud speaker[,] and said, 'We're not here to arrest anyone, go ahead.'"  J.A. at 282 (Young Dep. at 23); *see also* J.A. at 1041 (Reynolds Aff. at 2) ("[W]e were told by the Lincoln Park Police to go ahead and race."), 1046 (Ricks Aff. at 2), 1049 (W. Turner Aff. at 2), 1054 (Moore Aff. at 2), 1109 (T. Turner Aff. at 3).  Officer Douglas Muncey played rap music over a loudspeaker before the race began.  J.A. at 284-85 (Young Dep. at 25-26), 662 (Muncey Dep. at 69), 1042 (Reynolds Aff. at 3), 1047 (Ricks Aff. at 3), 1050 (Turner Aff. at 3), 1053 (Moore Aff. at 1), 1109 (T. Turner Aff. at 3), 1234 (Nasser Statement at 22).  In response to the music, the crowd "got hyper" and "everybody start[ed] hollering and . . . dancing."  J.A. at 287-88 (Young Dep. at 28-29); *see also* J.A. at 1050 (Turner Aff. at 3).  According to an eyewitness, "[i]t's like the police initiated the race to go on."  J.A. at 288 (Young Dep. at 29).  Indeed, Reynolds attested, "I would not have raced if the police officers had not told me that we could go ahead and race."  J.A. at 1042 (Reynolds Aff. at 3).

**II.**

In *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998), we recognized the state-created-danger theory of due process liability and laid out three requirements:  an affirmative act that creates or increases the risk, a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability.  *Id.* at 1066-67.  Jones has offered sufficient evidence to establish a genuine issue

of material fact with respect to at least the first two prongs of the *Kallstrom* test. Because the district court did not rule on the third prong,[1] I would reverse and remand the case to permit the court to address the issue in the first instance.

## A. Affirmative Acts that Create or Increase the Risk

"Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." *Id.* at 1066. The majority's conclusion that the officers committed no cognizable affirmative acts has two bases. First, the majority claims that the officers simply failed to stop or discourage the race from happening, such that all the state did was fail to act. *See Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) ("[F]ailure to act is not an affirmative act under the state-created danger theory."). Second, the majority opines that the officers did not increase the danger to Jones. According to the majority, even if the officers had not arrived at the scene, the race would have gone ahead as scheduled, placing Jones in the very danger she faced during the situation as it actually transpired.

Both strands of the majority's reasoning depend on partitioning the officers' conduct into two phases — (1) arrival at the scene and (2) everything else — and then considering only the first. I assume for present purposes that under our precedents, the police would not have committed an affirmative act if they had simply arrived at the race and done nothing, as that truly would have been a failure to act that did not create or increase the risk of the drag race. *But those are not the facts of this case, because that is not all the officers did.* Jones has offered evidence showing that the officers actually were quite busy upon their arrival: they reassured the racers, Reynolds and Atat, that the race could proceed; announced over a loudspeaker that they would not arrest anyone, so the race could "go ahead"; and played rap music over a loudspeaker, which had the effect (and perhaps the intent) of stirring up the crowd. The majority inexplicably refuses to acknowledge that Jones's claim is based on all of this conduct rather than the mere fact that the officers did not stop the race.

The majority offers no persuasive reason for ignoring these actions. It tries to wish away the facts by repeatedly invoking the principle that a failure to act does not state a due process violation, but that gets the inquiry exactly backward: the only way to determine whether the officers merely failed to act is by considering *all the facts*. The decisions cited by the majority certainly do not compel its myopic view of the facts, as none involved state officials arriving at a scene and then actually encouraging private actors to engage in dangerous acts or telling them that the state would look the other way. Furthermore, it is difficult to square turning a blind eye to post-arrival conduct with the principle that the Due Process Clause "is phrased as a limitation on the State's power to act." *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). This principle instructs us to look at the state's actions, not ignore them. It is why encouraging and condoning private actors' dangerous conduct is relevant to the due process inquiry and may form the basis of liability.[2] *E.g.*, *Pena v. Deprisco*, 432 F.3d 98, 111 (2d Cir. 2005) ("[W]hen . . . state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct . . . .").

I cannot help but wonder whether there is *any* post-arrival conduct that the majority wouldn't ignore. Could an officer have waved a green flag to signal the start of the race? Could a second officer have served

---

[1] Nor did the district court rule on the first prong. I address the issue here, however, because it is the basis of the majority's decision.

[2] This rule is not unique to direct state-created-danger claims. It is also, for example, a well-settled part of § 1983 supervisory-liability doctrine. *See, e.g.*, *Estate of Carter v. City of Detroit*, 408 F.3d 305, 314 (6th Cir. 2005) ("Supervisor liability attaches when a supervisor encourages or condones a constitutional violation.").

as a play-by-play announcer over the loudspeaker?  Could yet another officer have gotten behind the wheel and actually driven in the race against Reynolds?  In response to these questions, the majority concedes (albeit under the wrong rubric[3]) that officers would run afoul of the Due Process Clause by engaging in these three hypothetical acts.  This means that the majority detects a constitutionally significant difference between an officer waving a flag to signal the start of a race and an officer announcing over a loudspeaker that the racers may "go ahead."  The line between these two acts is too fine for me to see.  What rationale justifies treating these two acts differently?  Is it the physical distance between the officers and the racers (i.e., although here the officers were just across the street from the race, they would have had to be *even closer* to wave the starting flag)?[4]  Is it the prop used by the officer (i.e., the racers might have been encouraged by the officers giving the "go ahead" over a loudspeaker, but waving the flag would have shown that the officers *really meant it*)?  These reasons are obviously too flimsy to bear the weight of a constitutional distinction, yet the majority offers none of its own.  All we are left with, then, is the fact that the relevant conduct occurred after the officers arrived at the scene.  Perhaps the majority would remove its blinders for post-arrival conduct surpassing some higher level of egregiousness, but its reasoning certainly suggests no limits to its brand of willful ignorance.

It is clear, then, that the proper point of comparison is not the risk that Jones would have faced if the officers had never arrived at all, but the risk that would have existed had the officers arrived but not reassured the racers, announced that the race could go ahead, and played rap music (i.e., if they had not committed the acts that the majority ignores).  After the officers arrived but before they engaged in this additional conduct, people in the crowd were preparing to leave, some vehicles actually did leave, and one of the racers — Reynolds, the driver who struck Jones — was in the process of putting his car on a trailer and calling off the race.  This evidence suggests that the race would not have gone forward if the officers had not committed these additional acts upon their arrival at the scene.  By reassuring the racers and the people in the crowd that they could "go ahead" because they would not be arrested and by riling up the crowd with rap music played over a loudspeaker, the officers instead actually *encouraged* the race to proceed.  The officers' actions, which revived a drag race that was about to be abandoned, thus created or increased the risk of injury to Jones.

The majority attempts to foreclose this analysis by likening the case to *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003), and *DeShaney*.  In those cases, the state took temporary custody of the eventual victim based on suspicions of abusive circumstances; however, a lack of evidence left the state without legal authority to maintain custody, requiring the victims to be returned.  *Bukowski*, 326 F.3d at 705-06; *DeShaney*, 489 U.S. at 192.  Upon their respective returns, Lisa Bukowski was raped and Joshua DeShaney was beaten into a coma.  *Bukowski*, 326 F.3d at 706; *DeShaney*, 489 U.S. at 193.  In each case, the court held that the state did not create the danger because it "was merely returning a person to a situation with a preexisting danger."  *Bukowski*, 326 F.3d at 709 (relying on *DeShaney*, 489 U.S. at 201).

There are critical differences between the instant case and *Bukowski* and *DeShaney*.  Rather than merely suspecting a danger, here the police arrived and actually saw the private actors preparing for the drag race, i.e., the very danger that ultimately harmed Jones.  And rather than merely returning the victim to the status quo ante due to a lack of evidence of the risk, here the police encouraged the private actors to engage in the dangerous conduct even though they otherwise would have abandoned it.  For *Bukowski* to be truly analogous to the case at bar, the officers would have had to know the rapist was about to attack Bukowski and then tell the rapist to go ahead despite his willingness to stop.  Similarly, for *DeShaney* to be genuinely

---

[3]To be clear, I posit in each of these hypothetical questions that Reynolds's car ultimately strikes Jones, so a private actor is the direct cause of the harm.  Thus, the majority cannot brush the examples aside by simply claiming that the state-created-danger theory is not implicated at all.

[4]A fixation with physical proximity might explain why the majority repeatedly notes the fact that the race occurred in Detroit while the officers were in Lincoln Park.  While this geographical circumstance might be relevant to whether state law permitted the officers to *stop* the race, it has no bearing on whether the Constitution permits them to actively *encourage* the race.

analogous, the state social workers would have had to know DeShaney's father was about to beat his son and then encourage him to proceed even as he was about to give up the attack.  Surely *Bukowski* and *DeShaney* would have come out the other way in these hypothetical scenarios.

Of course (and as the majority agrees), it is unimaginable that state officials would act in the manner posed in these hypothetical variations on *Bukowski* and *DeShaney*.  But that is precisely the point:  Jones has presented evidence that the officers in the instant case *did* act unimaginably, by encouraging Atat and Reynolds to engage in a dangerous and illegal drag race that ultimately killed Jones (and by egging on the crowd to boot).[5]  If this evidence were credited by a jury, it would demonstrate that the officers committed affirmative acts that created or increased the risk of harm to Jones.

The conclusion that the officers' encouragement of the drag race constituted an affirmative act increasing the risk to Jones is consistent with other cases holding that where officers enable or embolden a private actor to drive dangerously, they commit an affirmative act for state-created-danger purposes.  In *Pena v. Deprisco*, the officers drank excessively with the private actor (an off-duty officer) and rode in the car with him while he drove drunk.  432 F.3d at 110-11.  The court held that a reasonable juror could find that the officers "implicitly but affirmatively condoned [the drunk driver's] behavior and indicated to [the drunk driver] that he would not be disciplined for his conduct."  *Id.* at 111.  In *Reed v. Gardner*, 986 F.2d 1122 (7th Cir.), *cert. denied*, 510 U.S. 947 (1993), the court held that "[p]olice officers who remove sober drivers and leave behind drunk passengers with keys may be said to create a danger or at least render others on the road more vulnerable."  *Id.* at 1125.  In *Nishiyama v. Dickson County*, 814 F.2d 277 (6th Cir. 1987) (en banc), a dangerous convicted felon in police custody was permitted to drive a patrol car unsupervised; he then pulled over a vehicle and beat its driver to death.  *Id.* at 279.  We explained that the officers who authorized the felon to drive the cruiser "facilitate[d] the crime by providing the criminal with the necessary means and the specific opportunity to commit his crime."[6]  *Id.* at 281.

There are obvious parallels between these cases and the instant case.  Officers knew or should have known of a potential driver who would be unquestionably dangerous if allowed on the road:  a drunk driver in *Pena* and *Reed*; a dangerous felon who could masquerade as a cop in *Nishiyama*; and drag racers here.  Rather than simply failing to act, the officers actively did something to enable or encourage the dangerous driver to proceed:  in *Pena*, they sent implicit signals condoning drunk driving; in *Reed*, they removed the car's driver and left behind the vehicle's keys with a drunk passenger; in *Nishiyama*, they handed over the keys for a patrol car to an unsupervised, dangerous felon; and here, they reassured the drag racers that they could race, announced over a loudspeaker that nobody would be arrested and that the race could "go ahead", and played rap music to energize the crowd.[7]

---

[5] One might argue that an impending rape or beating presents a more likely risk of harm than an impending drag race.  This is beside the point, however, because the test is whether the affirmative act created or *increased the risk* of harm.  Of course, the occurrence of a drag race presents a greater risk of harm than the absence of one.

[6] Quoting *Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997), *cert. denied*, 523 U.S. 1118 (1998), the majority notes that *Nishiyama* is "no longer an accurate statement of the law."  Majority Op. at 7.  *Stemler*'s repudiation of *Nishiyama* was only with respect to the requisite level of state culpability.  *Stemler*, 126 F.3d at 869 (explaining that gross negligence — the standard endorsed by *Nishiyama* — was no longer sufficient).  *Nishiyama*'s analysis of the officers' facilitation of private violence remains good law.

[7] Of course, the principle that officers commit affirmative acts when they encourage private misconduct that leads to violence is not limited to driving cases.  *See Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) ("[T]he officers conspired with the 'skinheads' to permit the latter to beat up flag burners with relative impunity, assuring the 'skinheads' that unless they got totally out of control they would not be impeded or arrested.  It requires no stretch to infer that such prior assurances would have increased the likelihood that the 'skinheads' would assault demonstrators.  Thus, in the present case, the complaint asserted that the defendant officers indeed had made the demonstrators more vulnerable to assaults."); *Freeman v. Ferguson*, 911 F.2d 52, 54-55 (8th Cir. 1990) (remanding to permit amendment of the complaint to allege that the police chief, who was a close friend of the attacker, had prohibited officers from interfering with the attacker, because such an allegation "presents a claim that the violence the decedents were subjected to was not solely the result of private action, but that it was also the result of an affirmative act by

The majority's decision rests on its conclusion that there was no affirmative act as a matter of law. Because I believe that Jones offered enough evidence to survive summary judgment with respect to the affirmative-act issue, I proceed to the remaining *Kallstrom* prongs.

## B. Special Danger

In addition to an affirmative act, "plaintiffs alleging a constitutional tort under § 1983 [must] show [a] 'special danger.'" *Kallstrom*, 136 F.3d at 1066. A special danger exists "where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Id.* The district court appeared to conclude that Jones failed to meet this prong because she was not "in any more danger than any other citizen in the area that evening."[8] J.A. at 61 (Dist. Ct. Order at 19); *see also id.* at 65 (Dist. Ct. Order at 23) (noting that Jones was not "in more danger on that evening than any other person on the street that night"). Apparently, the court believed that there was no special danger because Jones was in the same danger as the other members of the crowd, even though the crowd as a group was at greater risk than the public at large.

The district court's view of the special-danger requirement is inconsistent with our precedents. When we have rejected the existence of a special danger, the plaintiff faced the same danger as *the general public*. *E.g.*, *Schroder v. City of Fort Thomas*, 412 F.3d 724, 729 (6th Cir. 2005) (holding that traffic laws and enforcement practices posed "a general traffic risk to pedestrians and other automobiles"); *Jones v. City of Carlisle*, 3 F.3d 945, 949-50 (6th Cir. 1993) (holding that an epileptic driver was "no more a danger to [the plaintiff] than to any other citizen on the City streets"), *cert. denied*, 510 U.S. 1177 (1994); *Janan v. Trammell*, 785 F.2d 557, 560 (6th Cir. 1986) (holding that the plaintiff "was simply a member of the public at large"); *see also Mitchell v. Duval County Sch. Bd.*, 107 F.3d 837, 839 (11th Cir. 1997) ("[The plaintiff] must show that the state affirmatively placed him in a position of danger which was distinguishable from that of the general public."), *cited with approval in Kallstrom*, 136 F.3d at 1066.[9] In contrast, when the danger threatened a group including the plaintiff rather than simply the public at large, we have found a special danger to exist. *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 468-69 (6th Cir. 2006) (finding the existence of a special danger where the victim was a member of a group of children left in a classroom with an armed classmate); *Waller v. Trippett*, 49 F. App'x 45, 50 (6th Cir. 2002) (unpublished opinion) (finding that there was a special danger where the victim, who worked with inmates in a prison kitchen, "was a member of a limited and specifically definable group"); *see also Schroder*, 412 F.3d at 729 (rejecting the existence of a special danger where the state's actions "did not create a 'special danger' to *a discrete class of individuals* (of which the [plaintiff] was a member)" (emphasis added)).

A drag race consists of driving at dangerous speeds for a limited time and distance. The confined scope of the race means that it posed a greater danger to the people lining the street at that time than to the public at large, as most of the general population was not in the vicinity at the time of the race. In other words, the officers' actions set an out-of-control car hurtling toward a specific crowd of people at a specific time. Thus, the spectator crowd constituted a "discrete class of individuals," *Schroder*, 412 F.3d at 729, or

---

a state actor to interfere with the protective services which would have otherwise been available in the community — with such interference increasing the vulnerability of decedents to the actions of [the attacker] and possibly ratifying or condoning such violent actions on his part. Without such affirmative actions on the part of the chief of police, the danger faced by the [victims] would have arguably been less." (citation omitted)).

[8] The district court purported to resolve the summary-judgment motion on the basis of the third *Kallstrom* prong, i.e., state culpability. The substance of the analysis makes clear, however, that the court blended the second and third prongs and actually focused on the second prong, i.e., special danger.

[9] *Jones v. Union County*, 296 F.3d 417 (6th Cir. 2002), which held that there was no special danger where the state did not timely serve an ex parte order of protection on the plaintiff's ex-husband, *id.* at 431, is not to the contrary. As we explained in *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir. 2006), the state's failure left the plaintiff in the same position as the general public, i.e., unprotected against the ex-husband's potential attacks. *Id.* at 468 n.8.

"a limited and specifically definable group," *Waller*, 49 F. App'x at 50, that was at greater risk of injury than the general public. As a member of the spectator crowd, Jones faced a special danger.

The discreteness of the drag race distinguishes it from the dangers in decisions like *Jones v. City of Carlisle* and *Schroder v. City of Fort Thomas*. In *City of Carlisle*, we rejected a claim premised on the state's permitting a person known to suffer from uncontrollable epileptic seizures to maintain a driver's license, because the driver "was no more a danger to [the plaintiff] than to any other citizen on the City streets." 3 F.3d at 947, 950. The state's issuance of a license did not let a danger loose at a specific time and place, because the epileptic driver could have suffered a seizure at any time and could have been anywhere when it happened. Thus, he posed no special threat to a "discrete class of individuals" or a "limited and specifically definable group." In *Schroder*, we turned away a suit based on the state's failure to lower or enforce the speed limit of a street where the decedent was struck by a speeding car, because the state "did not create a 'special danger' to a discrete class of individuals (of which the [decedent] was a member), as opposed to a general traffic risk to pedestrians and other automobiles." 412 F.3d at 725, 729. The majority likens the instant case to *Schroder* because the asserted danger was spatially discrete, i.e., limited to a specific street, in both. Yet the state's conduct in *Schroder* (failing to lower or enforce the speed limit) did not unleash a speeding car on that street at a specific time. Thus, once again, no discrete, limited, or specifically definable group was at risk there.

Finally, the majority claims that our cases actually require the government to be able to "specify whom it was putting at risk, nearly to the point of naming the possible victim or victims." Majority Op. at 8. They say no such thing. We have never held that a group — short of the general public — is too large to be the target of a special danger. The folly of the majority's revisionist rule demonstrates why we have not heretofore adopted it: the majority denies that Jones faced a special danger because she was part of a crowd, yet it would presumably conclude otherwise if Jones had been the only spectator. Am I to believe that the Due Process Clause, which is "a limitation on the State's power to act," *DeShaney*, 489 U.S. at 195, shields the state when it endangers a *larger* subset of its citizens? My copy of the Constitution does not demand such perverse results. Thus, Jones has presented sufficient evidence to survive summary judgment with respect to the second *Kallstrom* prong.

## C. State Culpability

The final requirement of the state-created-danger test is that "[t]he state must have known or clearly should have known that its actions specifically endangered an individual." *Kallstrom*, 136 F.3d at 1066. As I have explained above at footnote 8, this third prong was the stated basis for the district court's grant of summary judgment to the defendants, but the substance of the district court's analysis clearly demonstrates that it was actually analyzing the second prong. Because it did not rule on the third prong, I would remand to the district court to address the issue in the first instance.

### III.

Whether a state official should intervene in private affairs is often a tough call, as potential land mines line the paths of both action and inaction. Indeed, this difficulty was a supporting rationale in *DeShaney*. The state was sued for leaving Joshua with his father, but "had [state social workers] moved too soon to take custody of the son away from the father, they would likely have been met with charges of improperly intruding into the parent-child relationship." *DeShaney*, 489 U.S. at 203. We, too, have recognized this tension. "By failing to detain Bukowski, [state officials] face this lawsuit. If they had chosen to detain her, they may have faced another lawsuit based on charges of false imprisonment." *Bukowski*, 326 F.3d at 712. That liability under the Due Process Clause is narrow reflects the urge to shield the state from liability when it faces such difficult choices. Here, however, the officers faced the following quandary when they arrived upon an illegal drag race and saw the racers and crowd preparing to forego the race before it started: (1) do nothing, leaving the race to be abandoned; or (2) reassure the racers that the race could proceed; announce over a loudspeaker that they would not arrest anyone, so the race could "go ahead"; and play rap music over a loudspeaker to rile up the crowd. The officers picked option two. Before

the majority's decision today, I would have thought it uncontroversial that this is not the type of state decisionmaking that *DeShaney* sought to protect. Due process means nothing if the officers' conduct here is all the process that Denise Jones was due.

Because I believe that Jones's evidence would satisfy the first two prongs of the state-created-danger test if credited by a jury, I would reverse the order granting summary judgment to the defendants and remand to the district court to address the third prong (and, if necessary, the issues of qualified immunity and municipal liability) in the first instance.

For the reasons set forth above, I respectfully dissent.