*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0288p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

ANTHONY LEE HILLS,

        *Plaintiff-Appellee,*

    *v.*

COMMONWEALTH OF KENTUCKY et al.

        *Defendants,*

NASIRUDDIN SIDDIQUI, M.D.,

        *Defendant-Appellant.*

No. 05-6298

> Appeal from the United States District Court
> for the Western District of Kentucky at Bowling Green.
> No. 04-00069—Thomas B. Russell, District Judge.

Submitted: July 21, 2006

Decided and Filed: August 9, 2006

Before: GILMAN and COOK, Circuit Judges; DOWD, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Ronald W. Crawford, OFFICE OF THE GENERAL COUNSEL, Frankfort, Kentucky, for Appellant. Anthony Lee Hills, Bowling Green, Kentucky, pro se.

_____

## OPINION

_____

    RONALD LEE GILMAN, Circuit Judge. After Anthony Lee Hills was arrested and charged with burglary, a Kentucky court ordered him transferred to the Kentucky Correctional Psychiatric Center (KCPC) for observation, assessment, and treatment because of questions regarding his competency to stand trial and his mental state at the time of the alleged crime. During the course of his treatment, Hills was forcibly administered an antipsychotic drug as authorized by the state court. The charges against him were ultimately dropped.

_____

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1

Hills subsequently sued the KCPC and several of its mental-health professionals, including Dr. Nasiruddin Siddiqui, alleging various constitutional violations arising out of his being forcibly medicated. Dr. Siddiqui filed a motion for summary judgment on the basis of qualified immunity. After the district court denied the motion, Dr. Siddiqui filed this interlocutory appeal. For the reasons set forth below, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.

## I. BACKGROUND

### A.  Factual background

In April of 2003, Hills was arrested and charged with first-degree burglary under Kentucky law. Approximately one week after his arrest, a state trial court ordered that Hills undergo a psychiatric examination at the KCPC to determine (1) whether he was competent to stand trial pursuant to the standard set forth in Ky. Rev. Stat. § 504.060(4), and (2) whether he met the definition of "insanity" set forth in Ky. Rev. Stat. § 504.060(5).

Hills was examined at the KCPC by Dr. Robert B. Sivley, Jr., who authored a seven-page psychological evaluation in May of 2003. The report concluded that Hills suffered from the delusion that God revealed to him in a dream that the burglary victim was his soulmate and that her child was his biological son, but that further inpatient assessment was necessary "to confirm the degree to which he suffers from a circumscribed delusion relating to the alleged victim and her son or has any other psychotic-type symptoms." Dr. Sivley reiterated this conclusion at the end of his report: "[I]t will be necessary to observe him on a more intensive and longer-term basis, in order to assess whether he has other psychotic symptoms which would be relevant to the criminal responsibility issue." As for the question of his competency to stand trial, Dr. Sivley determined that Hills had "a good understanding of basic legal procedures, terminology, and his own situation," but noted in passing that Hills's delusions "may impede his ability to participate rationally in his own defense, especially if he is unwilling to accept empirical evidence that the child in question is not his son (e.g., paternity testing) and chooses instead to believe his view of God's revealing that the child is actually his."

Presumably based on Dr. Sivley's recommendation, the state trial court issued a second order on June 10, 2003. This order stated that the case had "c[ome] on for hearing" (this is the only indication in the record that a hearing actually took place) and that "there is reason to believe that [Hills] is not mentally capable of understanding the charges against him or aiding his counsel in the trial of said case, but there is a substantial probability that the defendant will attain competency in the foreseeable future." Invoking Ky. Rev. Stat. § 504.110 (a provision dealing with commitment for treatment of defendants incompetent to stand trial but with a substantial probability of becoming competent), and Ky. Rev. Stat. § 504.070 (the code section providing for the mental examination of defendants wishing to introduce evidence of their insanity at the time of the offense), the order went on to state:

> IT IS HEREBY ORDERED pursuant to KRS 504.110 that Anthony Lee Hills be taken to Kentucky Correctional Psychiatric Center (KCPC) for treatment and examination, including forced medication and any restraint which may be necessary to effect such treatment, and to determine whether the patient meets criteria for criminal responsibility (504.070).

Ten days later Hills was sent back to the KCPC for further examination and treatment. He remained a patient at the KCPC from late June through late September of 2003. Throughout this period, Hills was interviewed and evaluated by several individuals, including Dr. Timothy Allen (a

KCPC psychiatrist) and Steven Simon, Ph.D. (a KCPC psychologist), both of whom were originally defendants in this action, but who have previously been dismissed.

The administration of forced medication that forms the basis of this suit occurred in August and September of 2003. By August 13, 2003, Hills had been at the KCPC for approximately seven weeks. The staff had concluded that Hills could benefit from a regimen of antipsychotic medication, but Hills persistently refused the recommended treatment. Such continuous refusals finally prompted Dr. Simon to have a telephone conversation with Rebecca Gibson, the court-appointed public defender assigned to represent Hills. The following day, August 14, 2003, Dr. Simon sent a two-page letter to Gibson reflecting the substance of their conversation. In the letter, Dr. Simon stated that the KCPC staff had concluded that the administration of antipsychotic medication could benefit Hills, but several weeks would be needed for the medication to take effect. Gibson, according to the letter, "related that [she] agreed with this and would relay this on to the court."

The next day, Hills's treating psychiatrist, Dr. Siddiqui, prescribed a course of 5 mg of Zyprexa, an antipsychotic drug, to be administered at bedtime. Over a two-week period, no therapeutic benefit was achieved from the drug, but Hills became increasingly angry. The dosage was then increased to 10 mg, but this increase did not produce a corresponding change in behavior. Finally the trial of Zyprexa was discontinued on September 10, 2003. Hills was transferred back to the county jail two weeks later. According to Hills, the burglary charge against him was eventually dismissed. He stated that "after eight months in jail on a case with no witness or no evidence I was released."

## B.    Procedural background

Hills filed a pro se complaint, handwriting relevant information on a form typically used by pro se prisoners bringing civil rights complaints. Attached to this form was a three-page typed letter in which Hills described his experiences while incarcerated and undergoing evaluation and treatment at KCPC. Demanding $3,000,000 in damages, he alleged violations of his First Amendment right to the free exercise of religion, his Sixth Amendment right to a speedy trial, and his Fourteenth Amendment right to the due process of law. Several defendants were named in the complaint, including the county jail, the sheriff's department, Hills's public defender, the KCPC, and Drs. Allen, Siddiqui, and Simon.

The defendants filed answers that included several affirmative defenses to Hills's complaint. Citing 28 U.S.C. § 1915(e) and *McGore v. Wrigglesworth*, 114 F.3d 601, 603 (6th Cir. 1997), the district court screened the complaint and dismissed all of the claims except those alleging Fourteenth Amendment violations against Drs. Allen, Siddiqui, and Simon in their individual capacities on the basis of the forced medication of Hills. The three doctors then filed a motion for summary judgment, to which Hills did not respond.

Dr. Siddiqui was the psychiatrist who actually prescribed the course of Zyprexa and increased its dosage. The district court concluded that Dr. Siddiqui was not entitled to qualified immunity because, despite the existence of the June 10, 2003 court order and the consent of Hills's attorney on August 13, 2003, it was "unreasonable to believe that his actions were lawful." Two reasons were given in support of this conclusion: (1) according to the court, the KCPC did not rely on the June 10 court order, allegedly evidenced by the fact that Dr. Simon felt it necessary to contact Gibson to ask whether Hills could be medicated against his will, and (2) Dr. Siddiqui could not have believed that his actions were lawful in light of the existence of a Kentucky statute setting forth detailed procedures that must be followed before forcibly medicating a patient.

On the other hand, the district court dismissed Drs. Allen and Simon from the action, to which Hills did not file a cross-appeal. Dr. Siddiqui then filed an interlocutory appeal from the denial of qualified immunity. Hills, still proceeding pro se, filed a brief in response, which consisted of a four-page letter.

## II. ANALYSIS

### A.    First Amendment claim

In Hills's letter brief, he argues that the district court improperly dismissed his First Amendment claim. The claim was based on the allegation that he was forcibly medicated because of his religious convictions rather than for any violent tendencies or other reason. After Hills filed his complaint, this claim was screened and dismissed by the district court as having no factual support. The district court did not certify the matter for interlocutory appeal, and Hills failed to seek permission from this court to hear the matter on an interlocutory basis. For that reason, we decline to review the claim at this stage of the proceedings. *See* 28 U.S.C. § 1292(b) (setting forth the procedure for interlocutory appeals).

### B.    Fourteenth Amendment claim

#### 1.    *The law of qualified immunity*

In determining whether a government employee is shielded from civil liability due to qualified immunity, this court typically employs a two-step analysis: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In addition to the two steps listed above, this court occasionally considers a third step in the qualified immunity analysis. *See id.* at 310 n.2 ("Panels of this court occasionally employ a three-step qualified immunity analysis, as opposed to the two-step analysis set forth here. . . . [B]oth the two-step approach and the three-step approach can be said to capture the holding of [*Saucier*].") (citations omitted). When utilized, this third step requires inquiry into "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 901 (6th Cir. 2004) (citation and quotation marks omitted).

The Supreme Court since *Saucier* has continued to analyze qualified immunity using the two-step approach, but this court has noted that "the three-step approach may in some cases increase the clarity of the proper analysis." *See Estate of Carter*, 408 F.3d at 310 n.2. If, on the other hand, the case at issue "is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable," then this court has "collapse[d] the second and third prongs" in an effort to "avoid duplicative analysis." *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005).

Throughout the analysis, the burden is on Hills to show that Dr. Siddiqui is not entitled to qualified immunity. *See Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) ("Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity.").

#### 2.    *Jurisdiction to hear this interlocutory appeal from the denial of qualified immunity*

Although a district court's denial of qualified immunity on purely legal grounds is immediately appealable, "[a] denial of qualified immunity that turns on evidentiary issues is not."

*Turner v. Scott*, 119 F.3d 425, 427 (6th Cir. 1997). "[A] defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). This is because interlocutory appeals are limited to questions that present "neat abstract issues of law." *Turner*, 119 F.3d at 428 (citations and quotation marks omitted).

The district court's denial of qualified immunity in this case was based on the conclusion that "[u]nder the clearly established Kentucky law setting forth Mr. Hills's due process rights governing administration of medication by force, it is unreasonable for Dr. Siddiqui to believe that his actions were lawful." There is no dispute about the underlying facts, but rather a question of whether, in light of those undisputed facts, Hills has demonstrated that Dr. Siddiqui violated a clearly established constitutional right possessed by Hills. This is a "neat abstract issue of law" that can properly be resolved on interlocutory appeal. *See Sample v. Bailey*, 409 F.3d 689, 695 (holding that the issue of "whether the facts as alleged by [the plaintiff] demonstrate a violation of a clearly established constitutional right" presents a "neat abstract issue of law") (citations and quotation marks omitted). We therefore have jurisdiction to decide the merits of Dr. Siddiqui's appeal.

### 3.　　*Whether the district court erred in denying Dr. Siddiqui qualified immunity*

Dr. Siddiqui makes no attempt in his brief to demonstrate how the district court erred in concluding that Hills was deprived of his constitutional right to due process, and instead focuses on the reasonableness of Dr. Siddiqui's actions in light of the June 10, 2003 court order and Dr. Simon's subsequent contact with Ms. Gibson. Although the burden is on Hills to prove that Dr. Siddiqui is not entitled to qualified immunity, *Silberstein*, 440 F.3d at 311, Dr. Siddiqui, as the appellant in this action, has waived any issues not contained in his opening brief. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 403 n.18 (6th Cir.1999) (en banc) (holding that issues not presented in an opening brief are waived). Because Dr. Siddiqui is not challenging the district court's determination that Hills's constitutional rights were violated, we will accept the conclusion of the district court and proceed to the second step of the qualified immunity analysis.

The second step is to ask whether the constitutional right that was violated was "clearly established." *Estate of Carter*, 408 F.3d at 310-11 (citing *Saucier*, 533 U.S. at 201). *Saucier* held that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202; *Malley v. Briggs*, 475 U.S. 335, 341 (1986) ("As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law.").

In this case, prior to Dr. Siddiqui's prescribing medication to be forcibly administered to Hills, two critical events took place. The first was the entry of the June 10, 2003 court order that authorized the transfer of Hills to the KCPC "for treatment and examination, including forced medication and any restraint which may be necessary to effect such treatment." Then, after seven weeks of treatment, the KCPC mental-health professionals concluded that Hills could benefit from a regimen of antipsychotic medication. This determination prompted Dr. Simon to contact Ms. Gibson about the prospect of forcibly medicating Hills. Gibson agreed to the administration of antipsychotic medication, and she said that she would relay this information on to the court.

In light of the existence of a court order allowing the forced medication of Hills, a reasonable governmental employee in Dr. Siddiqui's position would not have clearly known that his conduct was unlawful. The Kentucky statutory scheme requires that certain procedures be followed in order to forcibly medicate patients, but the result of those procedures is a court order. Ky. Rev. Stat. § 202A.196(4). There is no transcript in the record of the hearing culminating in the June 10, 2003

court order, so there is no way to know whether the state trial court made a set of findings that would comport with the Kentucky statute, or even the minimum requirements of the Due Process Clause. But even if we assume for the sake of argument that there was no such set of findings, Dr. Siddiqui would still be entitled to qualified immunity because neither our precedents nor the state statutes themselves require that the psychiatrist prescribing the medication to be forcibly administered must personally verify that the prerequisite procedures have been followed prior to the entry of the court order.

In ruling to the contrary, the district court concluded that the KCPC mental-health professionals did not rely on the court order, citing the fact that Dr. Simon found it necessary to contact Ms. Gibson on August 13, 2003 "to ask whether Mr. Hills could be medicated against his will." Dr. Simon's letter to Gibson, however, does not reflect that he asked her *permission* to forcibly medicate Hills, but only that she had no objection to the proposed course of action. The extra care that the KCPC mental-health professionals took by contacting Hills's counsel before forcibly medicating him should not vitiate Dr. Siddiqui's claim to qualified immunity. Rather, the fact that Gibson expressed her agreement with the forced administration of antipsychotic medication makes Dr. Siddiqui's conduct all the more reasonable.

In light of the foregoing, we conclude that Dr. Siddiqui did not violate a constitutional right of Hills's that was clearly established. The June 10, 2003 court order and contact with Ms. Gibson would lead a reasonable person in Dr. Siddiqui's position to conclude that his conduct was lawful. As such, the district court erred in denying him qualified immunity.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court and **REMAND** the case for further proceedings consistent with this opinion.