RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0020p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TRACY JEFFERSON,

        *Plaintiff-Appellee,*

    *v.*

    No. 08-2116

TERRY LEWIS,

        *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-10465—Avern Cohn, District Judge.

Argued: October 9, 2009

Decided and Filed: February 4, 2010

Before: MARTIN, GUY, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Michael S. Bogren, PLUNKETT COONEY, Kalamazoo, Michigan, for Appellant. Wolfgang Mueller, OLSMAN MUELLER, P.C., Berkley, Michigan, for Appellee. **ON BRIEF:** Mary Massaron Ross, PLUNKETT COONEY, Detroit, Michigan, for Appellant. Wolfgang Mueller, OLSMAN MUELLER, P.C., Berkley, Michigan, for Appellee.

    MARTIN, J., delivered the opinion of the court. GUY (p. 12) and McKEAGUE (p. 13), JJ., delivered separate opinions concurring in the result, with Judge McKeague also joining in Judge Guy's concurrence.

_____

## OPINION

_____

    BOYCE F. MARTIN, JR., Circuit Judge. While responding to a situation in which guns and gunfire were present, Officer Terry Lewis of the Flint, Michigan Police Department shot Tracy Jefferson while she stood in the doorway of her home. Although Officer Lewis

1

contends that he believed that she was firing at him, Ms. Jefferson turned out to be unarmed. She thereafter sued Officer Lewis under 42 U.S.C. § 1983 and state tort law. After discovery, Officer Lewis sought summary judgment on the basis of qualified immunity, but the district court denied his motion. Officer Lewis now brings this interlocutory appeal. For the reasons set forth below, we **AFFIRM**.

## I.[1]

On December 31, 2006 at approximately 10:30 p.m., Officer Terry Lewis of the Flint, Michigan police force responded to a report of "shots fired." It is apparently a mainstay of the Flint New Year's Eve celebration ritual to fire guns in the air and into a nearby lake. At that time, Officer Lewis had been on shift for what Jefferson contends was eleven hours because the Flint police force was short on officers.

When he arrived on location, Officer Lewis found several individuals who reported that shots had been fired and that bullets had hit near the individuals just before Officer Lewis arrived. They informed Officer Lewis that the shots were coming from the Woodhall Drive area and from across a field near West Pierson Road. During this conversation, Officer Lewis heard approximately six gunshots from what he estimated to be a heavy-caliber long gun.

Officer Lewis called for backup and drove to the place from which he believed the shots to have emanated. While driving, Officer Lewis heard several more gunshots but described them as being more faint. He parked his car a short distance from West Pierson Road. Officer Lewis exited his car and took his department-issued pump shotgun with him. He proceeded on foot to the place from which he believed that the first round of shots had come. While advancing, Officer Lewis heard several more gunshots from close-by and, fearing that they were directed at him, hid behind a car parked at 1313 West Pierson. He heard male voices from across a fence and moved to

---

[1]This is an interlocutory appeal of a denial of summary judgment. Therefore, this factual recitation consists primarily of undisputed material facts drawn from the parties' pleadings below on the summary judgment motion. In instances in which material facts are in dispute, we assume that Jefferson's version is true.

determine their location. He then saw two males near 1301 West Pierson, at least one of whom was holding a long gun, either a rifle or a shotgun.

As Officer Lewis began approaching the two men, a car passed and shined its lights on Officer Lewis. The two men turned toward Officer Lewis. The man with the gun, later identified as Thomas Manning, was pointing the gun in Officer Lewis's general direction. The other man, Victor Adams, was reaching into the trunk of a car. Officer Lewis advanced toward the two men with his shotgun pointed at them and instructed them to "freeze," drop their weapons, and put their hands against the wall of the house.

Adams and Manning testified that they immediately complied with Officer Lewis's command; Officer Lewis contends that Manning ducked behind a column and that Adams continued reaching into the trunk of the car. Either way, both men eventually complied with Officer Lewis's commands to drop their weapons and to put their hands against the wall. At some point during the initial confrontation between Officer Lewis and Adams and Manning, a third man, Taurean Stewart, emerged from between the car and the house. Officer Lewis instructed Stewart to freeze and to move against the wall. All three men were, at this time, against the wall, although Officer Lewis testified that the men continued to duck up and down and to move their hands toward their waists. Throughout the entire interaction, Officer Lewis saw only Manning holding a gun.

After Stewart appeared and Officer Lewis ordered him to place his hands against a wall, Officer Lewis heard what he describes as a "loud metal sounding" noise to his left. He looked and saw a fourth individual exiting the front door of the house. He saw that it was an unarmed woman and commanded her to go back inside the house.

Officer Lewis then detected movement to his right, where the side door of the house was located. As Officer Lewis tells it, he turned and saw that the door, a security door made of black Armor Guard and glass with a brass doorknob, was opening outward and that a person was standing in the doorframe. He perceived a hand with something metallic in it extended in his direction beyond the door frame and, at the same time, a

flash of light. Officer Lewis maintains that he believed that the flash was a muzzle flash from a gun and that the person in the doorway was firing on him. Officer Lewis never heard a gunshot, did not identify himself as a police officer, and did nothing further to ascertain whether the person in the doorway was, indeed, armed.

Instead, Officer Lewis immediately fired his shotgun at the person in the doorway. He did not chamber another round into his shotgun after firing the first shot and did not take cover to protect himself from future gunfire. However, he did yell "shots fired" into the microphone located on his lapel and immediately began patting his bullet-proof vest to see if he had been shot. As it turns out, the person in the doorway was Ms. Jefferson. She was unarmed and did not have anything shiny in her hand, except perhaps the doorknob. She testified that her right hand never left the door handle as she opened the door outward. Although Officer Lewis theorizes that the flash he claims to have seen could have been caused by the headlights of a car flashing off of the door, no one testified to having actually seen a car passing at the time. Ms. Jefferson further testified that there were no lights on in the carport area and that there were no lights on in the room behind her. Ms. Jefferson was injured, but the shot was not fatal.

Ms. Jefferson thereafter filed suit under 42 U.S.C. § 1983, claiming violation of her constitutional right to be free from excessive force, as well as a pendant state-law claim of battery.[2] After discovery, Officer Lewis sought summary judgment on the basis of qualified immunity. The district court denied the motion, stating that:

> For the purposes of this motion, the Court accepts Jefferson's account that she did not step outside of the house before being shot, did not extend her arm toward Lewis, and did not have any "shiny object" that might have given the appearance of a muzzle flash. Read in this light, the record shows that, without warning, Lewis shot an unarmed woman who had not threatened him from close range. Under these circumstances, Lewis did not have probable cause to believe that Jefferson was dangerous.

---

[2]The parties and the district court agree that the battery claim rises and falls with the section 1983 claim as far as the application of the qualified immunity defense. *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004).

*Jefferson v. City of Flint*, No. 07-cv-10465, 2008 U.S. Dist. LEXIS 59162, at *9-10 (E.D. Mich. Aug. 5, 2008).  Officer Lewis thereafter timely brought this interlocutory appeal.

## II.

### A.     Jurisdiction

Ms. Jefferson initially contends that we do not have jurisdiction to hear Officer Lewis's appeal due to its interlocutory nature—the district court denied Officer Lewis's motion for summary judgment but trial has not yet occurred; thus there is no final judgment.  We are not persuaded.

"The denial of a summary judgment motion usually presents neither a final appealable order nor an appealable interlocutory order."  *Floyd v. City of Detroit*, 518 F.3d 398, 404 (6th Cir. 2008).  However, a rejection of a defendant's assertion of the qualified immunity defense is a well-established exception to this rule to the extent that the appeal presents a question of law and does not require us to resolve disputes of material facts.  *Id.* (citing *Risbridger v. Connelly*, 275 F.3d 565, 568 (6th Cir. 2002)).  Thus, to bring an interlocutory appeal of a qualified immunity ruling, the defendant must be willing to concede the plaintiff's version of the facts for purposes of the appeal.  *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009) (citations omitted); *Sheets v. Mullins*, 287 F.3d 581, 585 (6th Cir. 2002).

Ms. Jefferson contends that there are disputed facts and that, because the district court found that disputes of material facts precluded summary judgment, we cannot entertain Officer Lewis's interlocutory appeal.  However, the "district court's assertion that there were genuine issues of material fact does not, standing alone, destroy the appealability of a qualified immunity ruling."  *Turner v. Scott*, 119 F.3d 425, 428 (6th Cir. 1997).  As the Supreme Court stated, "[d]enial of summary judgment often includes a determination that there are controverted issues of material fact . . . and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable."  *Behrens v. Pelletier*, 516 U.S. 299, 312-13 (1996); *see also Christophel v. Kukulinsky*, 61 F.3d

479, 485 (6th Cir. 1995) (stating that a "defendant's right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order"). Taking a dim view of the motivations of district judges, the *Turner* Court observed: "If it were otherwise a district court could always insulate its qualified immunity rulings from interlocutory review by mouthing the appropriate shibboleth. Such a result would jeopardize the immunity from suit that the qualified immunity doctrine is designed to protect." *Turner*, 119 F.3d at 428.

In this case, we may entertain Officer Lewis's interlocutory appeal as long as we accept Ms. Jefferson's version of those material facts that are actually in dispute. In his briefs, Officer Lewis states that he is willing to concede Ms. Jefferson's version of these facts for purposes of this appeal. Thus, we may exercise jurisdiction and resolve questions of law. However, if after our review we determine that resolution of the legal questions turns on which version of disputed facts one believes, we must allow the case to proceed in the trial court.

**B.      Qualified Immunity**

**1.      Legal Standard**

Government officials, including police officers, are immune from civil liability unless, in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights. *Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006). Stated differently, a "defendant enjoys qualified immunity on summary judgment unless the facts alleged and evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison*, 583 F.3d at 400 (citing *Jones v. City of Cincinnati*, 521 F.3d 555, 559 (6th Cir. 2008)).

Until recently, the analysis used to address an assertion of the qualified immunity defense was the two-step sequential inquiry set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). Under *Katz*, a court first had to ask whether, viewed in the light most favorable to plaintiff, the facts show that the officer's conduct violated a constitutional right. *Id.*

at 201.  If the answer to this first question was "no," the analysis proceeded no further because the plaintiff failed to establish a *prima facie* case of violation of a constitutional right and the officer need not even seek the protection of qualified immunity.  *Id.*; *Parsons v. City of Pontiac*, 533 F.3d 492, 500 (6th Cir. 2008); *Turner*, 119 F.3d at 429.

If, however, the facts established a violation of the plaintiff's constitutional rights, *Katz* mandated that the next step was to determine whether the constitutional right was "clearly established" at the time of the violation.  If not, the officer would be entitled to qualified immunity.  *Katz*, 533 U.S. at 201.  Under the "clearly established" inquiry, the question is whether the right was "so 'clearly established' that a reasonable official would understand that what he is doing violates that right."  *Parsons*, 533 F.3d at 500 (quoting *Charvat v. E. Ohio Reg'l Wastewater Auth.*, 246 F.3d 607, 616 (6th Cir. 2001)).  "This inquiry . . . must be undertaken in consideration of the specific context of the case, not as a broad general proposition . . . ."  *Katz*, 533 U.S. at 201.  Previously, this Court has included a third inquiry to "increase the clarity" of the *Katz* analysis:  "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."  *Floyd*, 518 F.3d at 405 (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 n.2 (6th Cir. 2005)).

However, in *Pearson v. Callahan*, __ U.S __, 129 S. Ct. 808 (2009), the Supreme Court recently abandoned *Katz*'s requirement that courts must address the qualified immunity inquiries sequentially.  *Id.* at 813.  The Court recognized that lower courts had complained that the sequential mandate was cumbersome and often forced courts to decide constitutional questions unnecessarily, and also recognized that the sequential mandate was impossible to force on any given judge's thought process.  On the other hand, the Court found that the *Katz* inquiry was still appropriate and a correct statement of the test for qualified immunity.  Thus, the Court held that,

> while the sequence set forth [in *Katz*] is often appropriate, it should no longer be regarded as mandatory.  The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity

analysis should be addressed first in light of the circumstances in the particular case at hand.

*Id.* at 818.  This means that "we are free to consider those questions in whatever order is appropriate in light of the issues before us," *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009), such that we need not decide whether a constitutional violation has occurred if we find that the officer's actions were nevertheless reasonable.  However, because *Pearson* left in place *Katz*'s core analysis, all pre-*Pearson* case law remains good law.

"All claims that law enforcement officers have used excessive force—deadly or not . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Floyd*, 518 F.3d at 405 (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).  We apply "the objective reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008) (citing *Graham*).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.  Further, we conduct the reasonableness inquiry objectively, based on the "information possessed" by the officer, without regard to the officer's subjective beliefs and without regard to facts not known by the officer at the time of the incident. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).  In an excessive force claim involving an officer's use of deadly force, the Supreme Court has instructed that the test is whether the officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

**2.      Analysis**

**a.      Has Jefferson Established a Constitutional Violation?**

As to the first *Katz* inquiry, whether, viewing the facts in the light most favorable to Jefferson and accepting her version of material factual disputes, her constitutional rights were violated, we believe the answer is "yes." "[O]nly in rare instances may an officer seize a suspect by use of deadly force." *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (quoting *Whitlow v. City of Louisville*, 39 F. App'x 297 (6th Cir. 2002)). These rare circumstances arise when the facts known to the officer at the time of the incident objectively give rise to probable cause to believe that the suspect poses a threat of serious physical harm to the officer or third persons. *Garner*, 471 U.S. at 11. Thus, while it is true that "[a]s a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers," *Floyd*, 518 F.3d at 407, whether a suspect is "nondangerous" is based on the facts known to the officer at the time of the incident, not on hindsight.[3]

In this case, Officer Lewis asserts that he saw a person standing in the doorway with a hand holding something shiny outstretched toward him and, at the same time, saw a flash that he believed to be a muzzle flash from a gun. Jefferson, however, asserts that her hand never left the doorknob, that there is no evidence of a car passing that could have produced the flash, and that there was no ambient light source that could have produced the flash. We believe that whether Officer Lewis had probable cause to believe that he was in danger of serious harm turns, in large part, on the resolution of this factual dispute. Because Jefferson has produced adequate evidentiary support for her version of events and because we must accept her version of events as true for purposes

---

[3]Jefferson would have us read *Floyd*'s pronouncement that "[a]s a matter of law, an unarmed and nondangerous suspect has a constitutional right not to be shot by police officers" as holding that if an individual turns out to have been unarmed and nondangerous it would be per se excessive to use deadly force against that person, regardless of the facts known to the officer at the time. We disagree that *Floyd* makes any such categorical holding for two reasons. First, the opinion itself does not support Jefferson's reading. And second, Jefferson's reading would directly contradict firmly established precedent holding that the reasonableness of an officer's use of force is not based on hindsight, but rather is based on what the officer knew at the time. *Dunn*, 549 F.3d at 353.

of this interlocutory appeal, we agree with the district court that the jury must decide whether Jefferson's Fourth Amendment rights were violated.

### b. Were Officer Lewis's Actions Unreasonable in Light of a Clearly Established Constitutional Right?

The second *Katz* inquiry is whether the right was clearly established and whether Officer Lewis's actions were objectively unreasonable in light of that clearly established right. In other words, in light of the undisputed facts and viewing any factual disputes in the light most favorable to Jefferson, was Officer Lewis's decision to fire at the individual standing in the doorway objectively unreasonable in light of a clearly established right to be free from deadly force? In this case, this turns on whether (a) Officer Lewis actually did see a flash in the doorway that he believed to be a muzzle flash from a gun and, (b) if so, whether that belief and his response were reasonable. If the answer to those two questions is an unequivocal "yes" even under Jefferson's version of events, then Officer Lewis is entitled to qualified immunity regardless of whether there was a constitutional violation. However, absent an unequivocal affirmative, the question of qualified immunity must be submitted to the jury.

As to the first question—whether Officer Lewis actually saw a flash of light in the doorway that he believed to be a muzzle flash—we have discussed above the factual dispute on this issue. Although Officer Lewis theorizes that the flash might have resulted from a passing car's headlights reflecting off the door, there is no evidence that a car actually did pass by at the time. Moreover, Ms. Jefferson contends that there were no lights on in the carport area and no lights on inside the relevant portion of the house, suggesting that it was highly unlikely that there actually was a flash. Though we are hesitant to doubt Officer Lewis's testimony that he saw a flash, "the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story . . . ." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). In this case, Ms. Jefferson's testimony regarding the lack of ambient light is sufficient to support an inference that could discredit Officer Lewis's testimony. At this stage, it is not our place to resolve these factual disputes.

The second question is whether (1) Officer Lewis's belief that the flash of light was a muzzle flash coming from the individual in the doorway shooting at him and (2) his reaction to that stimulus were objectively reasonable. The fact that most strongly cuts against the reasonableness of Officer Lewis's decision to "return" fire is that, even accepting Officer Lewis's testimony on its face, Officer Lewis only saw a flash; he heard no corresponding gunshot before he "returned" fire. Additionally, Officer Lewis did not chamber another round in his shotgun or seek cover, which one might expect an officer to do if he reasonably believed that he was being fired upon. But, on the other hand, it is uncontested that Officer Lewis immediately began checking his bullet-proof vest to see if he had been shot, a fact which certainly cuts strongly in Officer Lewis's direction. In light of the competing inferences one might draw from these facts and their effect on the question of whether Officer Lewis's actions were objectively unreasonable, we agree with the district court that the jury should find the facts that determine whether Officer Lewis is entitled to qualified immunity.

### III.

Based on the record as it currently stands, we find that the district court did not err in denying Officer Lewis qualified immunity at the summary judgment stage. My colleagues concur in this conclusion but not necessarily in the full opinion. We therefore **AFFIRM** the district court's decision and **REMAND** this case for trial.

---

**CONCURRING IN THE RESULT**

---

GUY, Circuit Judge, concurring in the result. I concur in the affirmance of the district judge's decision to deny defendant's motion based upon a claim of qualified immunity. It cannot be said at this stage that defendant's conduct was objectively reasonable as a matter of law.

I would leave it at that, however, and not parse the parties various contentions as to what actually occurred. We have only the record that was before the court at the summary judgment stage, which might differ from what the parties present at a trial. I do not join in those parts of Judge Martin's opinion that might be read to suggest what the outcome would be if one party or the other prevailed on their pre-trial contentions.

---

**CONCURRING IN THE RESULT**

---

McKEAGUE, Circuit Judge, concurring in the result. I concur in the result reached by Judge Martin. I also join Judge Guy's concurring opinion.