RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0113p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ESTATE OF LEON SMITHERS, by his Personal
Representative, Homer Norris, Jr.; ALAN
SHARP; ROBERT BONNER,
                    *Plaintiffs-Appellants,*

          *v.*

CITY OF FLINT; TERRANCE WALKER; BRIAN
MURPHREE, Officers; GACIA,
                    *Defendants-Appellees.*

No. 09-1164

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-40347—Stephen J. Murphy, III, District Judge.

Argued: March 11, 2010

Decided and Filed: April 21, 2010

Before: MARTIN and GIBBONS, Circuit Judges; MARBLEY, District Judge.[*]

_____

## COUNSEL

**ARGUED:** James M. Cull, CULL & CULL, Southfield, Michigan, for Appellants.
Michael J. Gildner, SIMEN, FIGURA & PARKER, P.L.C., Flint, Michigan, I'Lanta M.
Robbins, CITY OF FLINT LAW DEPARTMENT, Flint, Michigan, for Appellees.
**ON BRIEF:** James M. Cull, CULL & CULL, Southfield, Michigan, for Appellants.
Michael J. Gildner, SIMEN, FIGURA & PARKER, P.L.C., Flint, Michigan, I'Lanta M.
Robbins, CITY OF FLINT LAW DEPARTMENT, Flint, Michigan, for Appellees.

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of
Ohio, sitting by designation.

––––––––––––––––––

**OPINION**

––––––––––––––––––

BOYCE F. MARTIN, JR., Circuit Judge.  Plaintiffs Alan Sharp, Robert Bonner, and the estate of Leon Smithers appeal the district court's dismissal of their claims against Officers Brian Murphree and Terrance Walker and the City of Flint, Michigan alleging constitutional violations pursuant to 42 U.S.C. §§ 1983, 1985(2) & (3), regarding the events surrounding the fatal shooting of Smithers and the injury of Sharp and Bonner.  The officers took an intoxicated Shirley Washington Ewing, Smithers' girlfriend, into custody, ticketed her for trespassing, and released her to her mother shortly thereafter.  Washington then returned to Smithers' home and shot him, Sharp, and Bonner.  Plaintiffs' claims stem from the officers' decision to arrest Washington for trespassing rather than for domestic violence, which would have required her to be held for 20 hours, and, they argue, prevented the tragedy.  For the reasons set forth below, we **AFFIRM** the district court's entry of judgment for the defendants.

**I.**

On October 26, 2002, Smithers was in his Flint, Michigan home with Alan Sharp, Robert Bonner, Shirley Washington Ewing,[1] and Booker Washington watching television and playing cards.  According to Sharp, everyone was drinking and a verbal, but non-physical, argument began between Smithers and Washington, his girlfriend.  Smithers asked Washington to leave, but she refused.

Smithers telephoned the Flint Police Department requesting the removal of Washington, stating "I got a problem up here in the house.  I want someone to leave, they don't stay here."  Dispatcher Tanyanika Gibbs testified that, when she requested additional information, Smithers told her that someone was refusing to leave his house

––––––––––––––––––

[1]The parties and the court disagree on whether the assailant's name is Shirley Washington Ewing or Shirley Ewing Washington.  The district court refers to her as Washington and, to avoid confusion, we do so as well.  We likewise refer to Booker Washington as Mr. Washington.

and he was not going to say anything further. Gibbs dispatched Officers Brian Murphree and Terrance Walker to the residence with the dispatch code TWM, for "trouble with a man."

Bonner testified that the intoxicated Washington threatened to kill Smithers, Sharp, and Bonner, and stated that she intended go home and "retrieve her nine millimeter handgun" and that this "would be the last time that [Smithers] would ever call the police on her."

When the officers arrived, Officer Walker questioned Smithers and Washington. Smithers stated that Washington was his girlfriend but that she did not live there and that he wanted her to leave the residence. Smithers asked the "obviously intoxicated" Washington to leave. Sharp and Booker testified that Washington repeated her statement that "this would be the last time that [Smithers] would call the police on her," and stated that "if you take me to jail, I'm going to come back and kill 'em." The officers testified that they did not hear any death threats. When the officers informed her that she would be arrested if she did not leave, Washington stated "[f]*** -it, arrest me." Washington's brother, Mr. Washington, testified that he heard her state that she was "going to f*** y'all up when I get out of jail," as the officers handcuffed her and placed her in the back of the squad car. Smithers and his friends went back inside without locking the door. Meanwhile, Washington was taken to the Flint police station, booked, issued an appearance ticket for trespassing, and released. Washington called her mother to take her home. Washington returned to Smithers' house shortly after 7 p.m. with a gun, fatally shooting Smithers and wounding Sharp and Mr. Washington. Washington was convicted by a jury of second-degree murder.

On October 14, 2005, Sharp, Bonner, and the estate of Smithers filed suit in the Circuit Court of Genessee County, Michigan, alleging constitutional violations pursuant to 42 U.S.C. §§ 1983, 1985(2) & (3), and state law claims arising from the events surrounding the shooting incident. Plaintiffs allege that the officers "conspired with one another and other officers in the department, in an attempt to hide . . . the fact that the death and injuries should have been prevented by the Flint Police Department and its

officers."  Plaintiffs request monetary damages for "Defendants' negligent acts, failure to follow the proper procedures and . . . complete disregard of local, state and federal law and constitutional protections", alleging conspiracy and violation of the Fourteenth Amendment's Due Process and Equal Protection Clauses.  The matter was removed to federal district court on November 14.  On November 22, the district court remanded the state law claims.

On July 24, 2008, Magistrate Judge R. Steven Whalen heard oral argument on cross-motions for summary judgment.  Magistrate Judge Whalen filed a Report and Recommendation on September 2, 2008, recommending that the district court grant defendants' motion for summary judgment.  Following objections,[2] the district court adopted the Report and Recommendation on January 16, 2009, specifically overruling plaintiffs' objections and entering judgment in favor of defendants.  *Estate of Smithers v. City of Flint*, Slip Op., No. 05-40347, 2009 WL 117623, at \*11 (E.D. Mich. Jan. 16, 2009).  Plaintiffs timely appealed.

## II.

### A.        Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The "mere existence of some alleged factual dispute will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

---

[2]Defendants argue that plaintiffs waived their right to appeal because they filed their objections to the Report and Recommendation on September 15, 2008, more than 10 days after the Report was filed on September 2, 2008.  However, "[i]n *Patterson v. Mintzes*, 717 F.2d 284, 286 (6th Cir. 1983), this court concluded that when written objections to a magistrate's report are tendered beyond the 10-day period of 28 U.S.C. § 636(b)(1), but are nevertheless filed and considered by the district court, the criteria identified in [*United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981)] in justification of the waiver rule promulgated therein dissipate and the rule will not apply to bar appellate review."  *Kent v. Johnson*, 821 F.2d 1220, 1223 (6th Cir. 1987).  Thus, the district court's decision to consider the objections excused their untimely filing, and plaintiffs did not waive their right to appellate review.

## B.       Procedural Due Process

Plaintiffs allege that Washington made death threats in the presence of the officers and that the officers were therefore required to detain her for at least 20 hours for domestic violence, pursuant to MCL § 750.81a, rather than arresting her for trespassing and releasing her on an interim bond. The officers' failure to detain Washington for those 20 hours allegedly deprived plaintiffs of their Fourteenth Amendment rights to procedural due process. The district court disagreed and entered summary judgment on the procedural due process claim.

The Supreme Court has held that a state statute written in purportedly mandatory terms providing that "a peace office shall arrest" a person whom he has probable cause to believe has violated a domestic restraining order does not give rise to a protected property interest under the Due Process Clause. *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 749, 766 (2005). The Supreme Court found that police have the "discretion to determine that—despite probable cause to believe a restraining order has been violated—the circumstances of the violation or the competing duties of that officer or his agency counsel decisively against enforcement in a particular instance." *Id.* at 761. *Castle Rock* held that, even if a statute confers an individual entitlement to enforcement, this is not the "sort of 'entitlement' out of which a property interest is created." *Id.* at 764.

The district court found that MCL § 750.81a provides that a police officer may arrest an individual charged with domestic violence, not that he must.[3] The law gives

---

[3]MCL § 764.15a provides for the warrantless arrest of an individual whom the police believe has violated section 750.81a:

> . . . regardless of whether the peace officer has a warrant or whether the violation was committed in his or her presence if the peace officer has or receives positive information that another peace officer has reasonable cause to believe both of the following:
>> (a) The violation occurred or is occurring.
>> (b) The individual has had a child in common with the victim, resides or has resided in the same household as the victim, has or has had a dating relationship with the victim, or is a spouse or former spouse of the victim. As used in this subdivision, "dating relationship" means frequent, intimate associations primarily characterized by the expectation of affectional involvement. This term does not include a casual relationship or an ordinary fraternization between 2 individuals in a business or social context.

officers discretion in determining whether an action constitutes a domestic violence incident. While plaintiffs are correct that officers do not have the discretion to release an individual pursuant to MCL § 780.582a should she be arrested for domestic violence, the Supreme Court has held that police officers have discretion to determine whether to arrest someone for domestic violence in the first place, even if the relevant statute seems to make such an arrest mandatory. Thus, even assuming that the officers heard Washington make a threat, they had discretion not to arrest her on charges of domestic violence.

Thus, the district court did not err in granting defendants' motion for summary judgment on plaintiffs' procedural due process claim.

## C.     Substantive Due Process

Plaintiffs argue that the district court erred in finding that they had failed to establish a substantive due process claim based on a state-created danger when defendants released Washington. Essentially, plaintiffs argue that the officers created a danger to them when the officers chose to ticket Washington for trespassing and to release her, rather than to detain her for 20 hours on charges of domestic violence. They also argue that the officers' arrest of Washington for trespassing created an illusion of safety because plaintiffs believed that Washington would be held for 20 hours pursuant to a domestic violence arrest.

In *Deshaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court held that the Due Process clause does not "require[] the State to protect the life, liberty, and property of its citizens against invasion by private actors." *Id.* at 195. In both *Deshaney* and *Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003), the state took temporary custody of a minor, who would eventually become the victim, based on suspicions of abusive circumstances; however, the state did not maintain custody of the minors. *DeShaney*, 489 U.S. at 192, *Bukowski*, 326 F.3d at

---

Finally, MCL § 780.582a provides that an individual arrested without a warrant under section 764.15a, or for a violation of section 750.81a, cannot be released on interim bond by the police.

705-06.  Upon their respective returns, Joshua DeShaney was beaten into a coma and Lisa Bukowski was raped.  *DeShaney*, 489 U.S. at 193; *Bukowski*, 326 F.3d at 706.  In each case, it was held that the state "had played no part in creating the dangers faced by the petitioner nor did it do anything to render him any more vulnerable to them." *Lanman v. Hinson*, 529 F.3d 673, 682 n.1 (6th Cir. 2008) (citing *DeShaney*, 489 U.S. at 201); *see Bukowski*, 326 F.3d at 709.  Essentially, "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).

> A state-created danger claim has three elements:
>
> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (citing *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)); *see Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002) ("[S]tate officials may violate the Due Process Clause when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.").  As it is difficult to determine whether an officer's "behavior amounts to affirmative conduct or not, we have focused on 'whether [the victim] was safer before the state action than he was after it.'" *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007) (quoting *Cartwright*, 336 F.3d at 493).

We have been hesitant to find that the police's response to a 911 call is an affirmative act that increases the danger to the victim.  In *Koulta*, the police were called to the scene of Chrissy Lucero creating a disturbance at her ex-boyfriend's home.  The police told Lucero, who was visibly intoxicated and sitting in her car, "that she had '10

seconds to get out of [t]here.'" *Id.* at 444. She drove away and crashed into Sami Koulta's car approximately 10 minutes later. We held that:

> The officers' failure to administer a breathalyzer test . . . before ordering her to leave the property may well have been negligent, but it did not "create" or "increase" the danger—of Lucero drinking and driving—that pre-dated their arrival on the scene. The same is true of the officers' decision to order Lucero to leave the property. Consistent with the homeowner's understandable request, the officers told Lucero to "go home" when they arrived at the Offrink's home, and, when Lucero did not leave after saying she would, they ordered her to leave the property immediately. The claimant cannot maintain that Lucero never would have been drinking and driving that night but for the officers' conduct-given her acknowledged behavior before they arrived. And the claimant cannot maintain that Lucero would not have driven to the scene of the accident but for the officers' conduct. As Lucero acknowledges, the officers told her to "go home" when they first arrived and later ordered her to leave the property. Neither directive required Lucero to drive home if she lacked the capacity to do so. Nothing prevented her either (1) from driving down the block, then calling a cab or waiting to drive the rest of the way home after becoming sober or (2) from asking the officers for assistance in getting home.
>
> In the final analysis, Lucero's admitted proclivity to drink and drive that evening placed Koulta (and other people using the roadways) in as much danger before the officers arrived as afterwards. And much as the officers were in a position to head off the tragedy that materialized minutes later, a reality (and memory) that no court decision will eliminate, their conduct was no more an affirmative risk-creating act than the conduct of the officers in *DeShaney* (who returned an abused child to the custody of his abusive father) or *Bukowski* (who returned a mentally disabled girl to the stranger who had been sexually abusing her).

*Id.* at 446-47.

Plaintiffs here argue that the officers engaged in an affirmative act that created a danger when they released Washington from custody on the trespassing charge rather than holding her at least overnight on a domestic violence charge, creating an illusion of safety for plaintiffs. They suggest that the officers' decision to release Washington operated as an approval of her threats.

However, while this action may have been ill-advised, the officers' failure to hold Washington did not constitute an affirmative act. The officers exercised their discretion in arresting Washington for trespassing, rather than for domestic violence, for which they are protected under *Castle Rock*. Thus, the officers' first affirmative act had the effect of protecting Washington's eventual victims, at least for a short period of time.

Their second affirmative act, releasing Washington from custody, did not "create" or "increase" the danger to plaintiffs. The officers did not require or encourage plaintiffs to remain in the unlocked house or suggest that Washington would be held for 20 hours so as to imply that plaintiffs would be safe. Their actions did not constitute an approval of Washington's threats any more than the return of the children in *DeShaney* or *Bukowski* encouraged that those children should be further harmed. As in those cases, these events were tragic; however, the officers' actions could not have been interpreted by a reasonable juror to have created or increased the danger to plaintiffs.

### D.    Conspiracy

On appeal, plaintiffs argue that the district court erred in dismissing their charges of civil conspiracy pursuant to 42 U.S.C. §§ 1985(2) and (3) based on the intracorporate conspiracy doctrine.[4] Plaintiffs believe that the officers conspired with one another and the City, and then later with their attorney, in their statements that they had not heard

---

[4] The intracorporate conspiracy doctrine states that:

It is basic in the law of conspiracy that you must have two persons or entities to have a conspiracy. A corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation.

*Hull v. Cuyahoga Valley Joint Vocational Sch. Dist.*, 926 F.2d 505, 509-10 (6th Cir. 1991) (citations omitted); *see also Doherty v. Am. Motors Corp.*, 728 F.2d 334, 339 (6th Cir. 1984) (adopting the general rule in civil conspiracy cases that a corporation cannot conspire with its own agents or employees). In *Hull*, we found that the intracorporate conspiracy doctrine applies to claims brought under sections 1985(2) and (3). *Hull*, 926 F.2d at 510. The Supreme Court has recognized a circuit split on this issue, *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 n.24 (1984), but it has not yet acted to resolve it.

Washington's threats of violence and in not filling out the state-required domestic violence forms.[5]

However, plaintiffs have not submitted sufficient evidence of a conspiracy, outside of their own assertions, including any evidence of Officer Walker's alleged failures in record-keeping or any evidence that Officer Walker conspired with Officer Murphree or any other party, to survive a motion for summary judgment on this issue. Plaintiffs seem to be asserting that the fact that they have a different version of the events than that provided by the officers in their records and testimony means that the officers are necessarily conspiring with one another to mislead the court and deprive plaintiffs of an unnamed constitutional right. However, this alone is insufficient to permit a claim of conspiracy to survive a motion for summary judgment.[6]

Thus, the district court did not err in dismissing plaintiffs' civil conspiracy claim.

**E.       Equal Protection**

Plaintiffs argue that the district court erred in granting defendants' motion for summary judgment on their equal protection claim. Essentially, they argue that defendants treated their situation differently from other domestic violence situations because the aggressor in this incident was female, rather than male, and the event took place in a poor neighborhood.

"The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause." *DeShaney*, 489 U.S. at 197 n.3 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886)). To sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and

---

[5]Plaintiffs further argue that the officers' counsel conspired with Officer Walker to provide false testimony that Washington had not made any threats at deposition. However, this allegation is neither asserted in their complaint (as it arose after the complaint was filed) nor did plaintiffs request leave to amend their complaint so as to include it. This allegation was therefore not properly before the district court and is not properly before this Court.

[6]As plaintiffs failed to present sufficient evidence to survive a motion for summary judgment on their claim of conspiracy, we need not address the issue of whether the intracorporate conspiracy doctrine applies to protect police officers and police departments.

discrimination on account of it.  *Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000).
In other words, there must be proof of "some racial, or perhaps otherwise class-based,
invidiously discriminatory animus." *Id.* at 559-60 (citing *United Bhd. of Carpenters and
Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983)).

In the district court, plaintiffs alleged that Officers Murphree and Walker violated
plaintiffs' equal protection rights by treating the trespassing complaint differently
because the aggressor was a woman and because the complaint originated in a poor
neighborhood.  Plaintiffs assert that the protected class in this case is male victims of
domestic violence and that the alleged unequal treatment is the failure to arrest female
perpetrators of domestic violence.  Sharp and Bonner testified to their beliefs that the
officers would have responded differently to Washington's behavior had she been a man,
but neither testified to a belief that the type of neighborhood in which Smithers lived
contributed to the officers' actions.

However, neither Sharp nor Bonner cited additional evidence to substantiate their
beliefs that gender was a factor in the officers' responses.  Plaintiffs rely on statistics that
purport to compare male-female offender rates, unrestricted to domestic violence cases,
in Genessee and Wayne Counties.  The City provided statistics pursuant to the MCL
§ 23.257,[7] but these statistics do not appear to break out the numbers for domestic
violence apart from other offenses.  According to the statistics provided, a smaller
percentage of female offenders as compared to male offenders were arrested in Genesee

---

[7]MCL § 28.257 provides that:

The chief of police of each city . . . shall report to the department of state police, in a
manner prescribed by the department, the following information related to domestic
violence incidents:
(a) The number of assaults reported that involve an adult and a minor and the disposition
of those offenses.
(b) The number of assaults reported that involve either 2 male adults or 2 female adults
and the disposition of those offenses.
(c) The number of assaults reported that involve 1 male adult and 1 female adult and the
disposition of those offenses.
(d) The number of crimes reported that involve an individual and his or her spouse, his
or her former spouse, an individual with whom he or she has had a child in common, an
individual with whom he or she has or has had a dating relationship, or an individual
who resides or has resided in the same household; and the disposition of those offenses.
. . .
(e) Other statistics the director of the department of state police considers necessary to
obtain accurate and reliable data on the incidence of domestic violence in this state.

and Wayne Counties than in the State at large during 2002, the year of the incident, for all offenses, not just domestic violence. As the district court correctly found, "[n]either the statistics and the Plaintiffs' deposition testimony come close to satisfying their burden of demonstrating facts sufficient to overcome summary judgment." *Smithers*, 2009 WL 117623, at *11.

Plaintiffs also argue that the City failed to keep statistics on domestic violence and report them to the Michigan Department of State Police, as required by the State of Michigan. MCL § 28.257. Plaintiffs argue that the City failed to comply with the statute requiring it to submit statistics to the State on domestic violence incidents during the applicable year. This failure to report data in accordance with section 28.257, plaintiffs contend, entitles them to a jury instruction that documents not produced are considered to be adverse to the City.[8]

However, even had the requested statistics been provided, they would not have been sufficient to survive a motion for summary judgment. Plaintiffs claim that the alleged disparity in female offenders "can only be explained due to Defendant, City's [sic] closure of its jail, and its reliance, contrary to law, on the County of Genesee's policy of treating females on an 'individual basis.'" (Appellants' Brief at 20.) The requested statistical data would not necessarily prove out this point. Indeed, this data could show a number of things about the relevant counties apart from the contention that the police discriminate against male victims of domestic violence, such as relative efficiencies of the police or the rates of occurrence of offenses committed by men and women across the state. As such, plaintiffs were not entitled to a jury instruction on this point.

In short, plaintiffs' unsubstantiated opinions, that they believe that the situation would have been handled differently had the perpetrator been male, and the lack of

---

[8]Plaintiffs also argue, but provide no evidence, that the officers conspired with the City to deprive plaintiffs of their constitutional rights by failing to produce documents related to domestic violence cases.

statistics, which would be inconclusive at best, are insufficient to survive a motion for summary judgment. Thus, the district court did not err in granting defendants' motion.[9]

## III.

We therefore **AFFIRM** the district court's judgment.

---

[9]Moreover, plaintiffs argue that the district court erred in finding that defendants are entitled to qualified immunity and that plaintiffs had not established a cause of action against the City based on a theory of municipal liability. A finding that a constitutional violation occurred is required to deny defendants qualified immunity, *see Hills v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006), and to state a claim of municipal liability. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001). As set forth above, plaintiffs have not shown facts sufficient to find that a constitutional violation occurred. Thus, we need not reach the issues of qualified immunity or municipal liability.